UNITED STATES of America, Appellee,

v.

Luis SANCHEZ, Luz Alvarez, Luis Torres Maldonado, Carlos Delgado and Juana Dominguez, Defendants–Appellants.

Nos. 838 to 841 and 1003, Dockets 79–1236, 79–1237, 79–1246, 79–1271 and 79–7788.

United States Court of Appeals, Second Circuit.

Argued March 6, 1980.

Decided Sept. 9, 1980.

Ira Leitel, New York City (Carol Mellor, New York City, on briefs), for defendants appellants Sanchez and Maldonado.

Bruce Provda, New York City, for defendant–appellant Alvarez.

Mel A. Sachs, New York City (Steven G. Eckhaus, New York City, on brief), for defendant appellant Delgado.

Harold L. Levy, Brooklyn, N. Y. (Flamhaft, Levy, Kamins & Hirsch, Brooklyn, N. Y., on brief), for defendant–appellant Dominguez.

Vivian Shevitz, Asst. U. S. Atty., Brooklyn, N. Y. (Edward R. Korman, U. S. Atty. for the Eastern District of New York, and Harvey M. Stone, Asst. U. S. Atty., Brooklyn, N. Y., on brief), for appellee.

Before NEWMAN and KEARSE, Circuit Judges, and SIFTON, District Judge.*

KEARSE, Circuit Judge:

These are appeals from judgments of conviction entered in the United States District Court for the Eastern District of New York, Eugene H. Nickerson, *Judge.* Appellants Luis Sanchez, Juana Dominguez and Luz Alvarez were convicted of possession of cocaine with intent to distribute, in violation of 21 U.S.C. § 841(a)(1) (1976). Sanchez and Dominguez, along with appellants Luis Torres Maldonado, and Carlos Delgado, were convicted of conspiring to distribute cocaine and to possess cocaine with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1), 846. In addition, Dominguez and Delgado were convicted of being illegal aliens in unlawful possession of firearms, in violation of 18 U.S.C. App. § 1202(a)(5) (1976).

On their appeals from the convictions, appellants contend principally that certain searches and seizures violated their rights under the Fourth Amendment and that evidence derived therefrom should have been suppressed. They complain also of the government's failure to preserve certain reports relating to the testimony of one Olga Perdomo, an important government witness. In addition, Maldonado contends that he was illegally detained by immigration agents and that statements and documents derived from the detention should have been suppressed.

---

* Honorable Charles P. Sifton, of the United States District Court for the Eastern District of New York, sitting by designation.

For the reasons set forth below, we find no error in the district court's rulings with respect to Maldonado, Delgado and Dominguez, and we affirm their convictions. As to Sanchez and Alvarez, we conclude that the district court did not apply a correct standard in determining whether Sanchez voluntarily consented to the search of the apartment where he and Alvarez were staying. Consequently we vacate the convictions of Sanchez and Alvarez and remand for further proceedings.

I

The case arises out of events which came to a head on the evening of January 16, 1979. On that evening agents of various law enforcement agencies, including the United States Immigration & Naturalization Service ("INS"), the federal Drug Enforcement Administration ("DEA"), and narcotics and homicide task forces of the New York Police Department ("NYPD"), entered and searched three apartments in various sections of Queens, New York, which were the residences of certain of the appellants. At each apartment incriminating items were seized. The first apartment was that shared by Dominguez with one Lucy Garcia. After placing Dominguez and Garcia under arrest for illegal possession of weapons and narcotics,[1] the agents proceeded to the apartment of Delgado. There they questioned the persons present, who included Delgado, Maldonado, Alvarez and Sanchez, and seized various items from these persons and certain items found in the apartment. Delgado and Alvarez were arrested on charges of being illegal aliens; Maldonado was "detained" until his alien status could be determined, and was later charged with conspiracy to possess and distribute narcotics. Some of the officers then took Sanchez to a third apartment in Queens, where he and Alvarez resided. In Sanchez's presence, the officers conducted a thorough search of the apartment and seized various items including a large quantity of cocaine and some $234,000 in cash.

### A. The Suppression Hearing

The five appellants and Garcia moved to suppress the items seized during the evening of January 16 and the statements made by them during the course of the evening. The district court conducted a hearing on the motions to suppress on March 12-14, 1979. Four witnesses testified for the government: INS criminal investigators Sebastian Ortega and Victor Rita, NYPD officer Jose Flores, who was assigned to the federal Drug Enforcement Task Force; and DEA agent Richard Crawford. Garcia and Sanchez testified in support of the suppression motions.[2]

A background picture, leading up to the events of January 16, emerged as follows. In October, 1978, NYPD detective Thomas Healy, assigned to a homicide task force, was investigating a homicide believed to be narcotics related. An address book found on the victim listed, *inter alia*, the address 39–11 65th Place, apartment 2F, which was the apartment occupied by Dominguez and Garcia. In early January 1979, in connection with a narcotics investigation, Crawford was conducting a surveillance of Sanchez, then known to law enforcement officials as "John Burgos," and had observed Sanchez leaving an apartment he was believed to occupy at 61–20 Grand Central Parkway, and followed Sanchez first to the apartment of Dominguez and Garcia, and later to the apartment occupied by Delgado. Except as otherwise indicated, the following account of the events of January 16 is drawn from the testimony of the government witnesses, which was accepted by the district court on all disputed points.

### 1. The Dominguez–Garcia Apartment

Flores testified that at about 8:00 p. m. on January 16, he and Healy went to 39–11

---

1. Garcia was indicted with the five appellants here. We are informed by the government that she pleaded guilty after the suppression hearing. (Brief at 6 n.3.) She is not a party to this appeal.

2. Thomas Healy, a New York City police detective assigned to a homicide task force, was also called by the defense to testify regarding an address book which the defense sought to discover.

65th Place, to ask questions relating to the homicide. When they arrived at that address they commenced to interview other residents of the building about the occupants of apartment 2F. While they were so engaged, they were joined by DEA agent William Mockler, who informed them that a car had just pulled up to the building, carrying two women and a man, and that one woman had left the car and that he had seen lights go on in a second–floor apartment. While Mockler went back outside, Flores and Healy went up to the second - floor apartment, 2F, identified themselves as police officers to the woman who answered the door, and stated that they wished to ask her some questions about a homicide. The woman, later identified as Garcia, admitted them to the apartment. Garcia told them that she was from Puerto Rico and lived in the apartment with her roommate Juana Dominguez, also from Puerto Rico. Healy informed Garcia of her constitutional rights and Garcia said that she understood.

Meanwhile, Mockler and a Detective Robinson spoke with the man and woman who had remained in the car downstairs. The woman gave her name but denied living in the building. Mockler and Robinson brought them up to 2F, where Mockler told Flores that this woman's name was Juana Dominguez and Flores told him that Garcia had said that was her roommate's name. In Spanish, Flores asked Dominguez her name, where she lived, and where she was from.[3] Dominguez told him her name and stated that she lived in the apartment and was from Puerto Rico. Flores asked her a few questions about Puerto Rico, such as the location of the airport and what town Dominguez was from. When Dominguez was unable to answer these questions, Flores, a native of Puerto Rico, told her he did not believe that she was Puerto Rican, and read Dominguez her constitutional rights. In response to continued questions, Dominguez denied that there were any narcotics in the apartment, but admitted that there were two guns. She pointed them out to Flores, and Flores seized them.

In the meantime, Flores had told Mockler his suspicion that Dominguez was an illegal alien, and Mockler had relayed this suspicion to INS. Ortega and Rita, responding to Mockler's call, arrived at the apartment about half an hour after Flores' seizure of the guns. Ortega, also speaking Spanish, took over the questioning of Dominguez, who gave what Ortega considered vague answers to questions as to when she had left Puerto Rico, where she had gone to school in Puerto Rico, and where she had boarded a plane to come to New York. Dominguez showed Ortega a Puerto Rican birth certificate and a New York voter's registration card in her name. When Ortega asked if she had any other documents, Dominguez handed him a wallet. In the wallet Ortega found a driver's license, a picture of a child inscribed in Spanish "To Paulina," and two medical prescriptions, one for a Margarita Burgos and the other for a Paulina Pison. Dominguez explained that she was holding the prescriptions and photograph for two friends. On the basis of his interview with Dominguez and the accent of her Spanish, Ortega came to the conclusion that she was not from Puerto Rico, but from somewhere in South America.

Ortega told Dominguez that he did not believe that she was Puerto Rican and asked for her permission to search for documents which would show whether or not she was Puerto Rican, such as a passport or national identification card. According to Ortega's testimony, Dominguez, who appeared "very relaxed" and "[v]ery calm", said "Go ahead and look wherever you want." Ortega then asked Garcia for the same permission, and Garcia, who was also "very calm," replied, "Go ahead and look, but Juana is Puerto Rican." At this point Ortega considered that Garcia whom he had questioned and believed *was* Puerto Rican, was free to leave the apartment, but that

---

3. Flores testified that his role was principally that of interpreter with respect to the interrogees such as Dominguez who did not speak English. Flores had not previously been involved in the investigation which led to the events of January 16.

Dominguez was not, since he wanted to investigate her status further. The officers searched the apartment and found several ounces of cocaine, some material used to dilute narcotics, a scale and more than $4000 in cash. They also found various letters from Colombia addressed to Paulina Pison. Mockler placed both Dominguez and Garcia under arrest, for unlawful possession of weapons and narcotics. Hugo Montoya, the male companion who had been brought to the apartment with Dominguez, was permitted to leave.

At the hearing Garcia gave a different version of the events. She testified that she had gone out to dinner with Dominguez and Montoya. When they returned, she had come up to the apartment alone, while Dominguez and Montoya remained in the car outside. Shortly thereafter she heard very loud knocking at the door. She opened the door, and Healy and Flores came in, grabbed her by the arm, and sat her down in the kitchen. They questioned her in both English and Spanish, without advising her of her constitutional rights. About six more agents arrived later, including those who brought Dominguez and Montoya into the apartment. At no time did she give any of the agents permission to come into the apartment. Garcia stated that when Ortega questioned her he said: "You are not Puerto Rican. Take her away." None of the agents told Garcia that they wanted to search for documents or asked her permission to search, and she never gave such permission. She never made a statement such as, "Go ahead and look, but she is Puerto Rican."

### 2. The Delgado Residence

While these events were taking place at the Dominguez-Garcia apartment, DEA officials were attempting to locate Sanchez for questioning. Crawford had been informed by another agent that Sanchez's car was not at Sanchez's Grand Central Parkway address. Crawford therefore stationed himself in front of the address of Delgado's apartment, 86–16 60th Avenue, hoping Sanchez would arrive there. Between 9:15 and 9:30, he saw Sanchez arrive at the building in a gray Toyota, accompanied by a woman who was later identified as Sanchez's common law wife, defendant Alvarez. They went into apartment 5–Q. Crawford then went down and spoke to the building superintendent, who said that a couple from Colombia were living in that apartment. Crawford resumed surveillance and saw defendant Delgado enter the apartment around 9:45.

Sometime thereafter, Mockler, Healy, Flores, Rita and Ortega arrived at the 60th Avenue building. Healy and Mockler wanted to question Sanchez, and had asked Ortega and Rita to accompany them because they expected to encounter illegal aliens, including Maldonado whom they knew had previously been arrested by immigration officials. Crawford informed Mockler that Sanchez was in apartment 5–Q, and the immigration officers filled Crawford in on the events at the Dominguez–Garcia apartment. The six officers already mentioned were joined at some point by at least five others: Robinson, Special Agent Deignan, Detectives Guzman and Bizby, and an Investigator Logan. Eight of these officers, all dressed in civilian clothes, proceeded to apartment 5–Q. When the group of officers arrived at the apartment, Flores knocked on the door. Someone inside asked, "Who is it?" Flores answered in Spanish, "Police." A boy, later identified as Delgado's 13–year–old son, opened the door and Flores said in Spanish, "We would like to come in and talk to you." The boy stood back and opened the door wide, and six of the officers proceeded into the apartment. Flores showed his shield; none of the officers had a gun drawn. The officers saw two women in the apartment—one near the kitchen and one near the bedroom—and three men sitting on a couch in the living room. They did not ask any of the adults for permission to enter; none of the adults expressed an objection to their entry.

Rita asked the two women and the boy to go with him to a bedroom off the living room. They did so without objection. As Rita began to identify himself as an immigration officer, Robinson, who had accom-

panied them, called Rita's attention to the butt of a pistol on the shelf of a closet, the sliding door to which was open. Rita seized this gun along with a revolver and a derringer, which he saw on the shelf. Rita then repeated that he was an immigration officer and began to question the women about their status. One of the women identified herself as Luz Alvarez, and stated that she was a Colombian national visiting her husband in the United States. She was unable to give her husband's full name or his date of birth. The other woman was Delgado's wife, Luz Maria Mendez. She claimed to be a lawful permanent resident of the United States. Rita asked the two women for permission to search the area for documents to prove their status. Both women gave him permission, but Rita did not find any documents or correspondence. Alvarez was placed under arrest for being in the country illegally.

Meanwhile in the living room Flores read the three men–Delgado, Maldonado and Sanchez–their constitutional rights, in Spanish. They were asked if they understood, and answered affirmatively. Ortega then questioned each of the three as to his status. Maldonado said that he was from Colombia and had come across the Mexican border. He admitted that he had been arrested by immigration authorities a few weeks previously, which the DEA officials knew already, but was unable to give any explanation of his current status. He had no document showing his lawful presence or that he was scheduled for a hearing to determine his status. He did not know whether he had been released on bond, nor whether he was scheduled for a hearing. His answers to Ortega's questions were simply, "I don't know. My lawyer took care of everything." When asked his lawyer's name, Maldonado said he did not remember. Ortega told Maldonado that he would have to be taken to the immigration office to determine his status. The government apparently concedes that at this point Maldonado was under arrest.[4]

Ortega next questioned Delgado. Delgado said that he was from Colombia and had come across the Mexican border without a visa and without any inspection by an immigration officer. He had no application pending with the immigration authorities to alter his status. Ortega placed Delgado under arrest for being in the country illegally.

Ortega then questioned Sanchez. Sanchez stated that he was from Puerto Rico and he produced a Puerto Rican birth certificate and a voter's registration card. He was unable, however, to answer questions about Puerto Rico, such as where he had boarded a plane to New York and where he had gone to school. Sanchez said he had no permanent place to stay in New York because he had only recently arrived from Puerto Rico, and said he had stayed at various places whose addresses he could not remember. In response to questions from Mockler, translated by Ortega, Sanchez denied owning a gray Toyota, denied having driven any car recently, and again denied having any permanent address. At this point Mockler told Ortega, in English, that Sanchez had been under surveillance for some weeks and on several occasions had been followed to and from what Mockler believed to be his residence at 61–20 Grand Central Parkway, apartment 1504. According to Ortega, Sanchez's facial expression visibly changed when he heard this; Ortega decided to take Sanchez to the Grand Central Parkway apartment to try to substantiate his belief that Sanchez was not Puerto Rican and find some document which would show Sanchez's true nationality.

At some point Maldonado, Delgado and Sanchez were searched and handcuffed. Their personal effects, including their keys, were taken. No general search of the apartment was conducted, but Crawford seized some papers lying openly on a bureau and a table, including correspondence from

---

**4.** While Ortega tried to draw a distinction between mere detention and an arrest, it seems clear that when Maldonado was taken involuntarily to the INS office, he was "seized" for Fourth Amendment purposes. *Dunaway v. New York*, 442 U.S. 200, 207, 99 S.Ct. 2248, 2253, 60 L.Ed.2d 824 (1979).

Colombia, parking tickets, and what appeared to be a customer list for narcotics transactions, showing names and amounts of money.

Sanchez testified at the hearing and submitted an affidavit, giving a much different account of the events at Delgado's apartment. According to Sanchez, he and his wife Alvarez were at Delgado's apartment for dinner. Sanchez, Delgado and Maldonado were on a sofa in the living room watching television, with their backs to the apartment door. The doorbell rang–Sanchez heard only the doorbell, rather than knocking–and Delgado told his son to open the door. Sanchez then heard someone say "Police;" when he turned he saw an officer with a badge in one hand and a gun in the other, and more officers advancing with their guns drawn.[5] The officers put the three men against the wall, handcuffed them, and started to search the apartment. They took everything out of Sanchez's pockets and began to question him. Sanchez denied telling any of the officers that he was from Puerto Rico and denied that any of the officers had advised him of his rights.

### 3. The Sanchez Apartment

Delgado, Maldonado and Alvarez apparently were taken to the INS office in Manhattan. In accordance with Ortega's decision, however, Sanchez was taken to the Grand Central Parkway apartment, a five or ten minute drive away. Ortega had told him where he was going and had Sanchez's keys. Sanchez, his hands cuffed behind his back, was placed in a car with Ortega, Robinson and Healy. Mockler, Flores and Bizby followed in another car, and the two cars proceeded to Sanchez's apartment. In the car, Ortega again advised Sanchez of his constitutional rights. A security guard at the building entrance when they arrived admitted them when Ortega identified himself and the others as police officers. Five officers took Sanchez into the elevator and pushed the button for Sanchez's floor. At this point, Sanchez still denied living at that address. When they arrived at the door to apartment 1504, however, Sanchez volunteered, "Okay, that is my apartment. I live here." Ortega then told Sanchez that he did not believe Sanchez was Puerto Rican and, holding Sanchez's keys, asked him for permission to enter the apartment to look for documents which would indicate his nationality. Sanchez replied arrogantly, "Go ahead and look. You won't find anything." Ortega then handed the keys to Mockler. Mockler rang the bell and, when no one answered, unlocked the apartment door. The officers took Sanchez into the apartment and searched for nearly an hour. They found various documents belonging to Alvarez, including a Colombian passport which showed that that she had entered the United States from the Bahamas without an immigration inspection. They also found a large quantity of cocaine, some material used in "cutting" narcotics, a bullet–proof vest, a scale, and some $234,000 in cash. When confronted with the narcotics, Sanchez denied knowing anything about it. He said that the apartment was not really his, but belonged to a Pedro Oviedo, who paid Sanchez and Alvarez $500 a week to watch the apartment. Mockler placed Sanchez under arrest for possession of the cocaine.

Again, Sanchez's version of these events was much different. He denied that Ortega had advised him of his rights in the car, denied having any conversation with the officers in the hallway outside the apartment, and denied saying that they could "go ahead" and enter the apartment. On cross–examination Sanchez testified that he had first met Pedro Oviedo in a bar seven or eight months before, and that at their first meeting Oviedo offered to pay Sanchez, who had no job at the time, $500 per week to watch the apartment. Within the next two days Oviedo gave Sanchez the keys to the apartment, and Sanchez and Alvarez began to live there, with Oviedo returning to the apartment every twenty days or so from his travels.

---

**5.** Sanchez's affidavit stated that as Delgado's son opened the door, "at least 6 men, with guns drawn, ran inside yelling and screaming that everyone was under arrest."

## B. *The District Court Decision*

The district court denied the motions to suppress in all respects holding that entry into all three apartments and the searches of the Dominguez–Garcia and Sanchez apartments were voluntarily consented to. With respect to the standard by which voluntariness is determined, the court stated as follows:

A consent is not necessarily valid though it is "voluntary" in the sense that the defendant has made a conscious and knowing choice. The defendant may have succumbed to quite rational fears of brutality or other extralegal tactics or may have been imposed upon by fraud or other unfair means. As the Fourth Amendment states, the police must be "reasonable", and they may not act in an uncivilized manner. It is the arbitrary and unreasonable activities of the police against which the Amendment seeks to forfend.

But a valid consent may be made to a policeman's request to enter or search. And a consent is not improperly obtained because it is given out of a concern to mitigate the full consequences of proper legal proceedings or in the hope of escape from the law entirely. *United States v. Garcia*, 450 F.Supp. 1020, 1025 (E.D.N.Y. 1978). A consent is invalid under the Fourth Amendment only if the officers have transgressed civilized standards. No consent is effective if it is the product of plausible apprehension of brutality or other extralegal consequences.

(Slip Op. at 9–10.)

Applying those standards, the court found that the consents had been "properly obtained". The court accepted the testimony of the government officers on all disputed points, and expressly found "Ortega's entire testimony fully credible on all significant points." As to the Dominguez–Garcia apartment, the court concluded that Garcia had voluntarily admitted Healy and Flores to the apartment after they had identified themselves as police officers: "Garcia invited them to come in. They were not brandishing weapons or making threats of any kind." The district judge found that Dominguez had said to Ortega, "Go ahead and look wherever you want," that Garcia had told him, "Go ahead and look, but Juana is Puerto Rican." He found that both Dominguez and Garcia were "calm and relaxed" at the time, and concluded that the permission to search wherever the officers wished was "given without apprehension of improper conduct."

With respect to the entry into the Delgado apartment, the district court found:

Approximately eight officers and agents came to 86–16 60th Avenue. Flores knocked on the door. Someone inside said "Who is it?", and Flores in Spanish identified himself as police. According to Sanchez' testimony defendant Delgado, whose apartment it was, told his thirteen year old son to open the door. The door opened slightly. Flores said "we would like to come in and talk to you," and "can I come in?" The boy then opened the door wider and stood back. Three of the officers walked in and several others followed while several officers remained in the hallway. None of the adults objected.

\*   \*   \*   \*   \*   \*

. . . No threats were made, no weapons were displayed, and none of the occupants objected. The defendants in the apartment were not naive or unacquainted with the law. Indeed, Sanchez in testifying impressed the court as intrepid and cynical.

The officers were not bound to decline the invitation to enter until an adult had affirmatively voiced consent. Instead of delegating the boy to open the door Delgado could have gone himself to ascertain more details or could have refused to admit the officers. Before entering the officers had announced their identity and had declared their purpose to talk.

The court held that this constituted a valid consent to the officers' entry into the apartment and to their speaking with the defendants. The court found that the arrests were lawful, because the defendants had consented to speak with the officers, and

the officers developed facts from the interviews which gave them probable cause to believe Delgado, Maldonado and Alvarez were illegal aliens. The court found that the seizures of the guns and papers were lawful because the officers had not gone beyond the scope of the consent: they had not conducted a general search of the apartment, but merely seized items in plain view which they had probable cause to believe constituted evidence.

With respect to the search of the Sanchez apartment, the district court found Sanchez's testimony "wholly unworthy of belief," and concluded that Sanchez had "deliberately testified falsely." The court found as follows:

> Sanchez told the agents and officers to "go ahead and look". Ortega's testimony that Sanchez acted arrogantly was confirmed by Sanchez' demeanor and attitude on the witness stand. He showed himself as someone hardly likely to be intimidated by police officers. Although he was handcuffed, no threats were issued to him, and no weapons were drawn. He was not misled or given cause to fear brutality. Judging by the substance and manner of his testimony at the suppression hearing, it is entirely plausible that he supposed the officers and agents would believe his statement that he knew nothing of the narcotics paraphernalia, and cash found in the apartment. He gave a valid consent.

### C. The Trial of Dominguez, Delgado, Maldonado and Sanchez

Just before the trial of the five defendants was to begin, defendant Alvarez was in a hospital awaiting childbirth. The district court granted her motion for severance, and the case proceeded to trial against the other four defendants. Since no question is raised as to the sufficiency of the evidence as a whole,[6] we will summarize it only insofar as it relates to the issues on appeal.

The government's case rested chiefly on the incriminating items seized at the three apartments, on the testimony of five agents and officers - Crawford, Mockler, Healy, Ortega and Deignan - and on the testimony of Olga Perdomo, a government informant who had been based in Colombia. None of the defendants testified and aside from three witnesses on behalf of Delgado, none of the defendants called witnesses.

Against Dominguez the government introduced into evidence documents found in Dominguez's wallet and in her bedroom on January 16, and other items seized in the apartment including the cocaine, the two guns, $4,128 in currency, a triple–beam scale, and narcotics cutting material. Against Delgado the government introduced the list seized at the Delgado apartment, and Crawford expressed his opinion that it was a customer list indicating amounts paid by people whose names appeared on it. Against Sanchez the government introduced various items seized at the Sanchez apartment, including cocaine, cutting material and other narcotics paraphernalia, currency, a bullet–proof vest, and record books, including a yellow spiral notebook. Against Maldonado the government introduced various documents seized when he was arrested, including papers with various names and telephone numbers, some of which matched some of those found on a paper taken from Dominguez and found in the yellow spiral notebook seized in the Sanchez apartment.

In addition, Crawford and Deignan testified to their surveillance of the defendants during the two weeks preceding their arrest on January 16. Two portions of this testimony are relevant to the issues on appeal. First, Crawford testified that he had observed Maldonado board a train to Miami. Crawford testified that when Maldonado was interrogated at INS offices on the evening of his arrest, he denied ever having

---

**6.** Alvarez, Delgado and Dominguez contend that without the challenged evidence there was insufficient evidence to convict and that the indictments against them should be dismissed. Sanchez and Maldonado contend that if the challenged evidence is suppressed, they are entitled to new trials.

taken a train trip to Florida. Maldonado challenges the admission of his post arrest statements. *See* Part III *infra*.

Crawford and Deignan also testified that they had seen Delgado driving a certain Pontiac automobile. Crawford testified that he later examined compartments which had been fitted into the rear wheel wells of the Pontiac, and identified twelve photographs which showed the compartments. This testimony and the photographs were admitted over Delgado's objection. Delgado challenges this ruling on appeal. *See* Part IV *infra*.

Finally Olga Perdomo, who had been an informant in Colombia for the DEA since 1975, identified each of the defendants,[7] and gave extensive testimony for the government. Perdomo was familiar with the Colombian narcotics enterprise of one Griselda Blanco and had assisted Blanco by getting visas to enable her to send her narcotics couriers to the United States. Perdomo testified that she knew Delgado by the name Jaime Mendez,[8] and knew him to be a trusted confederate in Blanco's drug operation. Perdomo testified that Maldonado, whom she knew by the name Alvaro Mendez, had been sent by Blanco to the United States to handle Blanco's narcotics business here. She testified that she knew Dominguez as Paula, and Sanchez as Horacio, but did not know their last names. On one occasion Perdomo had been in Maldonado's apartment with a group of people including Dominguez and Sanchez, during a discussion of the state of the cocaine business. While Maldonado, Sanchez and Dominguez were present, someone came to the apartment and left a briefcase containing, according to Perdomo's observations, about five kilograms of cocaine. On another occasion Perdomo met Dominguez at a bar, and Dominguez stated that she was waiting for some friends "for a small deal."

Outside the presence of the jury, it was disclosed that Perdomo in 1976, 1977 and 1978 had given detailed information to various DEA agents, including dates of events, license plate numbers, addresses and telephone numbers, whereabouts of narcotics, etc. The government provided the defendants with a copy of one DEA report, which incorporated some of Perdomo's information and which was the only report, relating to any of these defendants, that could be located in New York or Colombia after exhaustive search. The government revealed that Perdomo's original handwritten notes given to DEA agents in Colombia in 1976 and 1977 had been destroyed in accordance with DEA procedures. Notes Perdomo had given to Crawford in New York in 1978 had been lost when Crawford's car was stolen. The defendants, citing the absence of Perdomo's original notes as an impediment to effective cross examination, sought to have Perdomo's testimony stricken. Their motion was denied, and they challenge this ruling on appeal. *See* Part V *infra*.

### D. *The First Verdicts*

At the end of the first day of deliberations the court, with the consent of the defendants, accepted a partial verdict from the jury. The jury found Maldonado, Delgado and Dominguez guilty on the conspiracy count, found Dominguez guilty of possession of cocaine with intent to distribute, and found both Delgado and Dominguez guilty of the firearms offenses charged. The jury had not reached any verdict with respect to the charges against Sanchez. After two more days of deliberations, the jury found Sanchez guilty of conspiracy, but was unable to reach a verdict on the charge of possession of cocaine with intent to distribute. The court declared a mistrial as to the latter charge against Sanchez.

### E. *The Trial of Sanchez and Alvarez*

Sanchez was retried, and Alvarez was tried, in June 1979, before Judge Nickerson and another jury, for possession of cocaine

---

**7.** Before Perdomo identified any of the defendants in open court, the trial was interrupted for a *Wade* hearing, outside the jury's presence, to test the reliability of the identifications.

**8.** The three persons who testified on behalf of Delgado stated that they did not know him by the name Jaime Mendez, but rather by the name Ivan Rios.

58

with intent to distribute. The transcript of this trial was not made part of the record on appeal and no claim of error is made with respect to the conduct of this trial. From the description of the trial provided in the government's brief on this appeal, it appears that the evidence against both defendants consisted chiefly of the items seized from the Sanchez apartment, including a customer book which contained Alvarez's handwriting. The jury found both Sanchez and Alvarez guilty.

## II

We turn first to the claims that the seizures of evidence at the three apartments violated the Fourth Amendment and that the items seized should therefore have been suppressed. The government seeks to justify the searches of the Dominguez–Garcia apartment and the Sanchez–Alvarez apartment on the basis of consent. With respect to the Delgado apartment, the government argues that there was a valid consent to the officers' entry into the apartment and that the guns and customer list were properly seized under the "plain view" doctrine.

The Fourth Amendment prohibits unreasonable searches and seizures. "[A] search conducted without a warrant issued upon probable cause is 'per se unreasonable . . . subject only to a few specifically established and well–delineated exceptions.'" Schneckloth v. Bustamonte, 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854 (1973). One such exception is a search that has been consented to by the lawful occupant of the premises. The consent is deemed to make the search "reasonable" for purposes of the Fourth Amendment. For such a consent to be valid, however, it must be voluntarily and freely given. It may not be the product of duress or coercion, flagrant or subtle:

[T]he Fourth and Fourteenth Amendments require that a consent not be coerced, by explicit or implicit means, by implied threat or covert force. For, no matter how subtly the coercion was applied, the resulting "consent" would be no more than a pretext for the unjustified

police intrusion against which the Fourth Amendment is directed.

. . . [I]n examining all the surrounding circumstances to determine if in fact the consent to search was coerced, account must be taken of subtly coercive police questions, as well as the possibly vulnerable subjective state of the person who consents.

Schneckloth v. Bustamonte, supra at 228–29, 93 S.Ct. at 2048–49.

The burden of proving that the consent was voluntarily given lies on the prosecution. Id. at 226, 93 S.Ct. at 2047; Bumper v. North Carolina, 391 U.S. 543, 548, 88 S.Ct. 1788, 1791, 20 L.Ed.2d 797 (1968). In determining whether this burden has been carried, no one factor is controlling. Rather, "the question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." Schneckloth v. Bustamonte, 412 U.S. at 227, 93 S.Ct. at 2047. Relevant considerations include, but are not limited to, the age of the subject, his level of education and of intelligence, and whether he was deprived of food or sleep or subjected to other physical abuse. Id.

When the claimed consent has been given by a person in custody it is appropriate to be "particularly sensitive to the heightened possibilities for coercion," see id. at 240 n.29, 93 S.Ct. 2055; but the fact of custody alone does not mean that a consent to search was coerced, United States v. Watson, 423 U.S. 411, 424–25, 96 S.Ct. 820, 828, 46 L.Ed.2d 598 (1976). Where there is no indication that the subject was "unable in the face of a custodial arrest to exercise a free choice," a valid consent may be given. Id. at 425, 96 S.Ct. at 828.

While the subject's knowledge of his right to refuse consent is a relevant factor, the Supreme Court has ruled that the prosecution is not required to demonstrate such knowledge as a prerequisite to establishing a valid consent. Schneckloth v.

*Bustamonte, supra* 412 U.S. at 235–46, 93 S.Ct. at 2051–57. (On the other hand, if the law enforcement agents have represented to the defendant that they have authority to search whether or not he consents, a permissive statement by the defendant cannot be deemed a voluntary consent. *Bumper v. North Carolina, supra* 391 U.S. at 548–50, 88 S.Ct. at 1791–92. In *Bumper*, the police had represented to the owner of the house that they had a search warrant; the owner allowed them to search. In seeking to use evidence found during that search in a prosecution of the owner's grandson, however, the State disavowed reliance on the warrant, and sought to prove that the search was reasonable because it was consented to. This contention was rejected because compliance with an officer's claim of authority is not a voluntary consent:

> When a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given. (This burden cannot be discharged by showing no more than acquiescence to a claim of lawful authority.) A search conducted in reliance upon a warrant cannot later be justified on the basis of consent if it turns out that the warrant was invalid. The result can be no different when it turns out that the State does not even attempt to rely upon the validity of the warrant, or fails to show that there was, in fact, any warrant at all.
>
> When a law enforcement officer claims authority to search a home under a warrant, he announces in effect that the occupant has no right to resist the search. The situation is instinct with coercion–albeit colorably lawful coercion. Where there is coercion there cannot be consent.

*Id.* (footnotes omitted).

Consistent with the above principles, we have upheld findings of valid consent where the defendant was detained for questioning for a brief period in a public place and informed that he had the option of refusing consent pending the agents' seeking a search warrant. *E. g., United States v. Vasquez–Santiago*, 602 F.2d 1069, 1073 (2d Cir. 1979); *United States v. Vasquez*, 612 F.2d 1338, 1347 (2d Cir. 1979). But we have held that there was not valid consent when a defendant merely handed over his suitcase to a uniformed sky marshal who took the defendant into a stairwell, closed the door, and either "asked" him to submit to a search or, told him "he would have to go through a baggage search." *United States v. Ruiz–Estrella*, 481 F.2d 723, 728 (2d Cir. 1973). Similarly we have refused to find consent when a police "demand . . . with gun in hand, could very reasonably have been understood . . . to mean that the officers intended to search the apartment whether they had permission to do so or not." *United States v. Mapp*, 476 F.2d 67, 78 (2d Cir. 1973). In the latter cases the government had shown no more than an acquiescence in and submission to apparent lawful authority, and the conduct of these defendants did not constitute consent.

With this framework in mind, we consider the events of January 16.

## A. *The Dominguez–Garcia Apartment*

■ We have little difficulty in affirming the district court's conclusion that the government met its burden of showing that Dominguez's consent was voluntarily and freely given under all the circumstances.[9] The court was in the best position to assess the credibility of the witnesses, and could properly choose to believe the testimony of Ortega and the other officers over that of Garcia. The court found that two officers had come to the apartment to ask questions about a homicide. They were in civilian clothes, displayed no guns, and made no threats. Garcia admitted them to the apartment and talked with them voluntarily. Dominguez and Montoya, accompanied by agent Mockler and Detective Robinson,

---

9. In light of this holding we need not decide whether the consent given by Garcia alone would have justified the search of Dominguez's bedroom, in addition to the shared rooms of the apartment. *See United States v. Matlock*, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974).

arrived at the apartment a short time later. Dominguez, who apparently does not speak English, was questioned only in Spanish. The questioning officers candidly told her they did not believe she was Puerto Rican, and advised her of her Fifth Amendment rights. It is true that several officers were present, but there is no indication that the circumstances were inherently coercive. Both women were calm and relaxed. They were in their own apartment; and throughout, their friend Montoya was also there.

Given all of these circumstances we hold that the district court's ruling that Dominguez gave a valid consent to the search is not clearly erroneous.[10] The suppression motion was properly denied.

### B. *The Delgado Apartment*

■ We turn next to the legality of the entry into the Delgado apartment. Delgado argues (1) that by opening the door Delgado's 13–year–old son did not consent to the officers' entry, but merely submitted to a show of authority; and (2) that in any event, the son's consent was not such a third–party consent as would bind Delgado, cf. *United States v. Matlock*, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974). These arguments, however, misperceive the factual basis of the district court's ruling. The district court based its decision not on a consent by a 13–year–old boy on his own initiative, but on the actions of Delgado in sending his son to open the door.

The district court found that Flores knocked on the door and identified himself as "Police." Delgado told his son to open the door. The boy opened the door, and,

when Flores said, "we would like to come in and talk to you," the boy opened the door wider and stood back. As the district court said: "Instead of delegating the boy to open the door Delgado could have gone himself to ascertain more details or could have refused to admit the officers." He did none of these things, and voiced no objection when the officers entered. Thus, there is no indication that Delgado's son exceeded the authority given to him by Delgado. Given these facts, we need not consider whether the entry could be justified on the consent of the boy alone under the principles of *United States v. Matlock, supra.*

We conclude that the district court's finding that Delgado consented to the officers' entry is not clearly erroneous. Since Delgado does not challenge the district court's finding that the guns and documents seized in the apartment were in plain view, and hence lawfully seized if entry into the apartment was lawful, *see Coolidge v. New Hampshire*, 403 U.S. 443, 465–68, 91 S.Ct. 2022, 2037–39, 29 L.Ed.2d 564 (1971), Delgado's motion to suppress was properly denied.

### C. *The Sanchez–Alvarez Apartment*

■ Finally we consider the search of the apartment occupied by Sanchez and Alvarez. The circumstances of the Sanchez search were rather different from those of the other two apartments, and it is not clear to us that the district court took all of the circumstances into account in finding that Sanchez voluntarily consented to the search.[11]

---

**10.** Dominguez argues also that Mockler, without probable cause to arrest, had taken her into custody before bringing her up to the apartment and that, by analogy to *Dunaway v. New York, supra,* her consent to the search was invalidated by an unlawful detention. We do not reach this question because Dominguez made no argument in the district court that she had been illegally arrested. And at the suppression hearing there was no testimony by either Mockler or Robinson, who had first encountered Dominguez outside the building and brought her up to the apartment, or by Dominguez herself or by her companion. Thus, not only was the district court uninformed of this

legal contention, it lacked any factual predicate for a ruling on such a contention. Under these circumstances, Dominguez has waived the argument that her consent was the product of an illegal detention.

**11.** While the district court spoke of a test centering on police brutality or incivility and did not refer to *Schneckloth v. Bustamonte, supra,* it appears that with respect to the Dominguez search and the Delgado entry, all of the circumstances were considered. Hence, despite the articulation of an erroneous standard, the rulings as to the Dominguez and Delgado issues were correct under the proper standard.

At the Delgado apartment, Ortega decided to take Sanchez to the residence where he had been observed by Mockler. Sanchez was so informed, and was handcuffed and taken by three officers in a police car, with three officers following in another car, to the Grand Central Parkway address. Sanchez denied living at the apartment to which they were heading. Five of the officers took Sanchez into the building; Sanchez persisted in his denial that he lived there until they reached the front door of his apartment. At that point, the district court found, Sanchez stated " 'Okay, that is my apartment. I live here.' " Then Ortega, with Sanchez's keys in his hand, asked for permission to search, and Sanchez responded, "Go ahead and look. You won't find anything." The district court found that Sanchez, whom he viewed, after having observed him testify, as arrogant and intrepid, was not intimidated, not threatened, not misled, and was given no cause to fear brutality or other uncivilized behavior by the officers. We do not view these findings as clearly erroneous; but in the circumstances, they are not adequate.

The district court does not appear to have considered the possibility that the circumstances of Sanchez's detention and the trip to the apartment may have led him to believe that the officers had the right and the intention to search his apartment even if he did not consent. Five officers brought him to his door. They had his keys. The officers went there "thinking there might be some documents at that location to show the nationality of Sanchez" (district court opinion at 7). Ortega's words or his manner, or the fact that he had Sanchez's keys, or the fact that as Ortega asked for Sanchez's consent he held Sanchez's keys in his hand, or a combination of all of the circumstances, could well have led Sanchez to believe that in fact he had no choice. If this was his belief, and Sanchez was merely submitting to authority, his statement would not have constituted a valid consent.

It is not clear, however, that the circumstances reflected in the present record compel such a conclusion. Sanchez did not testify that he made these statements because he felt he had no choice. Instead, he testified that he said nothing whatever when they arrived at his door. The district judge did not credit this testimony. Indeed he concluded that Sanchez deliberately gave false testimony. The court found that Sanchez had told the officers he did not remember the addresses of the places he had stayed after arriving in New York. Ortega testified that even after entering the building, Sanchez claimed he did not know where he was. And Sanchez persisted in denying that he lived there until they reached the apartment door. It may be that Sanchez thought the officers were simply calling his bluff on his denial of where he lived, and understood that they would not, at that time, enter if he did not consent.

In any event, the finding before us that Sanchez was neither threatened nor intimidated does not, in light of the circumstances under which his alleged consent was obtained, establish that his consent was voluntarily given. What is lacking is explicit consideration by the trial judge as to whether or not Sanchez, believing the officers were going to enter regardless of what he said, merely submitted to their authority. We therefore remand to the district court for additional findings of fact and for reconsideration of whether the prosecution carried its burden, in light of the proper standard. If the district court finds, in light of "the totality of all the circumstances," that Sanchez voluntarily consented to the search, and not that he merely bowed to what he reasonably viewed as the exercise of authority, new judgments of conviction should be entered against Sanchez and Alvarez. If, on the other hand, such a voluntary consent is not found, the motion to suppress the items seized in Sanchez's apartment should be granted; a new trial should be ordered as to Sanchez, and the district court should determine whether the non–excludable evidence against Alvarez was sufficient to warrant a new trial as to her.

### III

█ Maldonado claims that his arrest at the Delgado apartment was illegal because

the officers knew that he had previously been arrested for being in the country illegally and knew, or could easily have determined, that he had been released on bond. Assuming that his arrest was illegal, Maldonado argues that his denials, following that arrest, that he had boarded a train to Miami, were not admissible against him. We find little merit in the contention that the arrest was illegal.

Following the arrests at the Dominguez-Garcia apartment, Ortega accompanied the DEA agents to Delgado's apartment because they told him they expected to encounter illegal aliens. They mentioned Maldonado and said that he had been arrested by immigration officials some weeks before. This information justified Ortega's questioning of Maldonado as to his status, even though he did not, at the outset, have probable cause for an arrest. *See, e. g.,* *Ojeda–Vinales v. INS,* 523 F.2d 286, 288 (2d Cir. 1975); *Lee v. INS,* 590 F.2d 497, 502 (3d Cir. 1979); *Cheung Tin Wong v. United States Imm. & Naturalization Service,* 468 F.2d 1123, 1127 (D.C.Cir.1972); *Au Yi Lau v. United States Imm. & Naturalization Svce.,* 445 F.2d 217, 223 (D.C.Cir.), *cert. denied,* 404 U.S. 864, 92 S.Ct. 64, 30 L.Ed.2d 108 (1971).

Maldonado's responses to Ortega's questions provided Ortega with sufficient grounds to make the arrest. Every alien over the age of eighteen is required to carry with him at all times evidence of registration as an alien. 8 U.S.C. § 1304(e). Failure to do so is a misdemeanor.[12] For an alien who has become a permanent resident of the United States, evidence of registration is INS Form I–151, familiarly known as the "green card." An alien who has been arrested and released on bond pending deportation proceedings is provided with an order to show cause form, Form I–221,

which for him constitutes evidence of registration. 8 C.F.R. § 264.1(b). Form I–221 bears the following legend in solid capital letters:

### NOTICE TO RESPONDENT

THE COPY OF THIS ORDER SERVED UPON YOU IS EVIDENCE OF YOUR ALIEN REGISTRATION WHILE YOU ARE UNDER DEPORTATION PROCEEDINGS. THE LAW REQUIRES THAT IT BE CARRIED WITH YOU AT ALL TIMES.

*See, e. g.,* 2 C. Gordon & H. Rosenfeld, *Immigration Law and Procedure* § 10.8a(7), at 10–38 to 10–39 (rev.ed.1980).

In response to Ortega's questioning, Maldonado admitted that he was Colombian and had been arrested for illegal entry into the United States some weeks earlier. However, he produced no evidence of registration and virtually no information suggesting that his presence in the United States had in any way been legitimated. He had no "green card," no Form I–221, nor any other evidence of registration. He was unable to state whether a bond had been posted for him; he could not state the name of his lawyer; he purported not to know whether a hearing was scheduled. In light of Maldonado's failure to carry any documentation, Ortega was entitled to infer that Maldonado either had not been lawfully released, or had violated some condition of his bond, as, for example, by failing to appear for the scheduled hearing.

Section 287(a) of the Immigration and Nationality Act, 8 U.S.C. § 1357(a), gives an INS agent authority to arrest an alien without a warrant if the agent has "reason to believe"[13] that the alien is in the United States in violation of the immigration laws and is likely to escape before a warrant can

---

**12.** Despite the government's attempt in this Court to justify Maldonado's arrest on the theory that the officers had probable cause to believe that Maldonado was violating § 1304(e), there is no indication that Maldonado was ever charged with violating that section, and Ortega's testimony was that he "detained" Maldonado in order simply to determine his status.

**13.** As used in § 287, "reason to believe" is the equivalent of probable cause. *Au Yi Lau v. United States Imm. & Naturalization Svce., supra,* 445 F.2d at 222; *see Ojeda–Vinales v. INS, supra.*

be obtained.[14]  We conclude that Maldonado's failure to produce any of the required documentation and his inability to give any details whatever as to his status justified Ortega's placing him under arrest.  *See Cheung Tin Wong v. United States Imm. & Naturalization Svce., supra* at · 1128–29; *United States v. Castro–Tirado*, 407 F.Supp. 210, 211 (E.D.N.Y.1976).  Hence we hold that Maldonado's post–arrest statements were properly admitted into evidence against him.

### IV

When Delgado was arrested on January 16, one of the items taken from him was a set of keys to a Pontiac automobile which Crawford had observed Delgado driving on January 4.  The automobile was parked legally on the street and was not seized at the time of Delgado's arrest.  A week later, the Pontiac was still parked outside of Delgado's apartment building.  A motor vehicle check revealed that the car was registered to a Hernan Loiza, at an address which turned out to be an auto repair shop.  A certified letter mailed to Loiza was later returned to DEA marked "Addressee Unknown."  Meanwhile, believing the Pontiac may have been falsely registered, Mockler had asked a New York State Police officer to bring it to the DEA garage for safekeeping and impoundment.

After its arrival at the DEA garage Crawford and other officers searched the Pontiac and found secret compartments in its rear wheel wells.[15]  Photographs were taken of these secret compartments.

Delgado sought unsuccessfully to prevent admission of these photographs, and of the testimony of Crawford describing the compartments.  While recognizing that an automobile that is seized other than as incident to a lawful arrest may be searched without warrant for purposes of taking an inventory of its contents, *see South Dakota v. Opperman*, 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976), Delgado argues that the search of the Pontiac violated the Fourth Amendment because it went beyond the bounds of a permissible inventory search.  *Cf. id.; Cady v. Dombrowski*, 413 U.S. 433, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973).  We do not reach the merits of this claim, however, because Delgado has not met his burden of showing that he has standing to complain of the search of the Pontiac.

A defendant has no right to have evidence excluded as violative of Fourth Amendment rights unless the rights violated were his own.  *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978).  In *Rakas*, the Supreme Court

> reaffirmed the established rule that a court may not exclude evidence under the Fourth Amendment unless it finds that an unlawful search or seizure violated the defendant's own constitutional rights .  .  .   And the defendant's Fourth Amendment rights are violated only when the challenged conduct invade *his* legitimate expectation of privacy rather than that of a third party.

*United States v. Payner*, —— U.S. ——, ——, 100 S.Ct. 2439, 2444, 65 L.Ed.2d 468 (1980) (emphasis in original).  A defendant

---

**14.**  Section 287(a) provides in part as follows:
Any officer or employee of the Service authorized under regulations prescribed by the Attorney General shall have power without warrant—
(1) to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States;
(2) to arrest any alien who in his presence or view is entering or attempting to enter the United States in violation of any law or regulation made in pursuance of law regulating the admission, exclusion, or expulsion of aliens, *or to arrest any alien in the United States, if he has reason to believe that the*

*alien so arrested is in the United States in violation of any such law or regulation and is likely to escape before a warrant can be obtained for his arrest,* but the alien arrested shall be taken without unnecessary delay for examination before an officer of the Service having authority to examine aliens as to their right to·enter or remain in the United States
.  .  .  .

(Emphasis added.)

**15.**  Mockler testified that the Pontiac was then "put under seizure" under the authority of 21 U.S.C. § 881.

can demonstrate that his own legitimate expectation of privacy has been infringed by showing that he owns the premises or property subjected to search, *see Rakas v. Illinois, supra,* 439 U.S. at 143 n.12, 99 S.Ct. at 430, or by showing that he occupies and has dominion and control over the premises or property by leave of the owner, *see Jones v. United States,* 362 U.S. 257, 267, 80 S.Ct. 725, 734, 4 L.Ed.2d 697 (1960) *overruled on other grounds, United States v. Salvucci,* — U.S. —, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980). On the other hand, a mere trespasser has no Fourth Amendment protection in premises he occupies wrongfully. Thus, in *Rakas,* the Court observed as follows:

> The Court in *Jones* was quite careful to note that "wrongful" presence at the scene of a search would not enable a defendant to object to the legality of the search. 362 U.S., at 267 [80 S.Ct. 725]. The Court stated: "No just interest of the Government in the effective and rigorous enforcement of the criminal law will be hampered by recognizing that anyone legitimately on premises where a search occurs may challenge its legality by way of a motion to suppress, when its fruits are proposed to be used against him. *This would of course not avail those who, by virtue of their wrongful presence, cannot invoke the privacy of the premises searched.*"

439 U.S. at 141 n.9, 99 S.Ct. at 429 (emphasis added by the Court). Consistent with these parameters, we have held that where a defendant had the keys to a car and permission from the owner to use it he had standing to challenge the search of the car, *see United States v. Ochs,* 595 F.2d 1247, 1253 (2d Cir.), *cert. denied,* 444 U.S. 955, 100 S.Ct. 435, 62 L.Ed.2d 328 (1979); but where the car driven by one defendant with the other defendant as a passenger was registered in someone else's name, and neither defendant showed any legitimate basis for being in the car, neither had standing. *See United States v. Smith,* 621 F.2d 483 (2d Cir. 1980).[16]

■ In the present case Delgado demonstrated neither ownership of the Pontiac, nor license from the owner to possess the Pontiac. His possession of the keys was not sufficient to give him a constitutionally protected interest in the privacy of that car. The registered owner of the car, Hernan Loiza, did not appear below; it appears that he was never located by the government. The burden was on Delgado to establish his standing to object to the search. He failed to do so and his motion to suppress Crawford's testimony and the photographs of the wheel wells was properly denied.

## V

We turn finally to appellants' claim that Perdomo's testimony should have been stricken because of the government's failure to produce the written reports Perdomo had made.[17] According to the government, reports made by Perdomo to DEA agents in Colombia in 1976 and 1977 were routinely destroyed when those agents made their formal reports relating to the information supplied by Perdomo.[18] In addition, in

16. The issue which divided the Court in *Smith* was whether a remand was appropriate to give the defendant an opportunity to prove standing where he arguably was not put on notice of the need to prove standing. That issue is not present here, since at the mini–suppression hearing the district court explicitly stated that no one had proven standing.

17. The defendants also requested that the government produce at trial the two DEA agents to whom Perdomo had reported in Colombia. In light of the information described in note 18, *infra,* the court denied the request. This was clearly within the court's discretion,

and defendants do not press this point on appeal.

18. Apparently all material still in existence was supplied. The Assistant United States Attorney informed the court that she had questioned a DEA agent to whom Perdomo had given reports in Colombia, who was now stationed in Chile, and that the agent had stated that any material he received from Perdomo would be found in the Colombian file. Mockler informed the court that he had contacted one of the DEA agents in Colombia and requested that the entire DEA informant file be sent to New York. The file that he received purported to contain all of the reports prepared by DEA agents with

1978, Perdomo had given Crawford five or six pages of handwritten notes on hotel stationery, relating principally to an investigation of someone other than the defendants here, but containing some information relating to Maldonado. Crawford had made no formal report using the information on Maldonado and had kept Perdomo's notes in his briefcase. Unfortunately the briefcase was in Crawford's car in January 1979 when the car was stolen. Although the car was later recovered, the briefcase and the notes were not.

▮ The Jencks Act [19] imposes a duty on the government, after a government witness has testified on direct examination, to deliver to the defendant upon request any statement of the witness in the government's possession which relates to the subject matter of the testimony. While the statute might be read literally to apply only to statements in the government's possession at the time of trial, we have made clear that it also imposes a duty on the government to preserve such statements. *United States v. Bufalino*, 576 F.2d 446 (2d Cir.), *cert. denied*, 439 U.S. 928, 99 S.Ct. 314, 58 L.Ed.2d 32 (1978); *accord United States v. Carrasco*, 537 F.2d 372 (9th Cir. 1976); *United States v. Harrison*, 524 F.2d 421 (D.C.Cir.1975). Obviously such a duty is necessary to prevent wholesale avoidance of the government's obligations by routine destruction of statements made to government agents. As the Ninth Circuit said in *Carrasco*:

> [T]he fact that Gamez's statement is no longer in the possession of the United States, *see* 18 U.S.C. § 3500(b), does not excuse what happened here. The Jencks Act is no less violated by the destruction of a statement than by its non-production. To hold otherwise would create an exception as broad as the Act itself.

537 F.2d at 377. In *Bufalino*, we issued a strong warning against routine destruction of documents by government agencies:

> [W]e will look with an exceedingly jaundiced eye upon future efforts to justify non-production of a Rule 16 or Jencks Act "statement" by reference to "department policy" or "established practice" or anything of the like. There simply is no longer any excuse for official ignorance regarding the mandate of the law. Where, as here, destruction is deliberate, sanctions will normally follow, irrespective of the perpetrator's motivation, unless the Government can bear the heavy burden of demonstrating that no prejudice resulted to the defendant.

576 F.2d at 449 (footnote omitted).

These comments apply with full force to the DEA's apparently routine practice of

---

respect to information supplied by Perdomo, and was given to the court for inspection. The court examined the file in camera and found nothing relating to the defendants.

**19.** The Jencks Act, 18 U.S.C. § 3500, provides in part:

(b) After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified. If the entire contents of any such statement relate to the subject matter of the testimony of the witness, the court shall order it to be delivered directly to the defendant for his examination and use.

\* \* \* \* \* \*

(d) If the United States elects not to comply with an order of the court under subsection (b) or (c) hereof to deliver to the defendant any such statement, or such portion thereof as the court may direct, the court shall strike from the record the testimony of the witness, and the trial shall proceed unless the court in its discretion shall determine that the interests of justice require that a mistrial be declared.

(e) The term "statement", as used in subsections (b), (c), and (d) of this section in relation to any witness called by the United States, means–

(1) a written statement made by said witness and signed or otherwise approved by him;

(2) a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously with the making of such oral statement; or

(3) a statement, however taken or recorded, or a transcription thereof, if any, made by said witness to a grand jury.

66

destroying, after formal reports are prepared by DEA agents, the notes or reports that had been provided by the informants themselves. In any case where the informant testifies, his notes or report may well be vital to a defendant's attempt to test the witness' recollection or undermine his credibility. The agent's formal report may omit useful information; or such information as is incorporated may be colored by the agent's interpretation.[20] Fairness dictates that if the government chooses to use the testimony of an informant, the defendant should have access to the witness' complete statement. The fact that at the time it received the informant's report the government did not intend to use the informant as a witness, is not an adequate excuse for not preserving the report. These decisions are entirely within the government's control, and if the government wishes to preserve its flexibility to call such an informant as a witness, it must simply preserve his written reports. As we said in *Bufalino*, "any resulting costs in the form of added shelf space will be more than counterbalanced both by gains in the fairness of trials and also by the shielding of sound prosecutions from unnecessary obstacles to a conviction." *Id.* at 450.

█ In the circumstances of this case, however, the district court did not err in declining to impose sanctions against the government. While the record does not disclose the exact date of the destruction of Perdomo's reports, the reports were apparently made in 1976 and 1977, and a DEA report was made in 1977. We have previously declined to impose sanctions against

the government for the destruction of documents which occurred prior to May 10, 1978, the date of our decision in *Bufalino*. *United States v. Paoli*, 603 F.2d 1029, 1036–37 (2d Cir. 1979). As we said in *Paoli*, "No useful deterrent purpose would be served by penalizing the government for having followed a policy which we understand has since been abandoned." *Id.* at 1037. The same rationale applies here.[21]

As to the notes Perdomo gave to Crawford in 1978, which were lost by him in January 1979, when his car was stolen, the district court correctly declined to impose sanctions against the government since the loss was inadvertent. *See United States v. Miranda*, 526 F.2d 1319 (2d Cir. 1975), *cert. denied*, 429 U.S. 829, 97 S.Ct. 69, 50 L.Ed.2d 82 (1976).

## CONCLUSION

The convictions of Maldonado, Delgado and Dominguez are affirmed. The convictions of Sanchez and Alvarez are vacated and remanded for further proceedings in accordance with this opinion.

---

**20.** There is far less likelihood of a similar misinterpretation or inconsistency when the agent makes a formal report based on his own notes. Hence the government is not required to preserve those notes. *Killian v. United States*, 368 U.S. 231, 242, 82 S.Ct. 302, 308, 7 L.Ed.2d 256 (1961); *United States v. Anzalone*, 555 F.2d 317, 321 (2d Cir.), *on rehearing on another issue*, 560 F.2d 492 (2d Cir. 1977), *cert. denied*, 434 U.S. 1015, 98 S.Ct. 732, 54 L.Ed.2d 760 (1978); *United States v. Jones*, 360 F.2d 92 (2d Cir. 1966), *cert. denied*, 385 U.S. 1012, 87 S.Ct 721, 17 L.Ed.2d 549 (1967); *United States v. Comulada*, 340 F.2d 449 (2d Cir.), *cert. denied*,

380 U.S. 978, 85 S.Ct. 1343, 14 L.Ed.2d 272 (1965).

**21.** In approving the district court's failure to impose sanctions against the government, we decline to join in the government's speculative assertion that the destroyed reports "would have shed minimal doubt on [Perdomo's] testimony." (Brief at 69.) There is no indication that the reports were seen by anyone other than Perdomo herself and the agents in Colombia to whom they were made. Nor, as we pointed out in *Bufalino*, will we " ' "speculate whether [Jencks material] could have been utilized effectively" at trial.' " 576 F.2d at 449.