**UNITED STATES of America**

v.

**Walter WILSON, Defendant.**

**No. 12 CR 610(RPP).**

United States District Court, S.D. New York.

Dec. 18, 2012.

lien holder and Plaintiff's purchase-money security interest.

Amy Garzon, United States Attorney's Office, SDNY, New York, NY, for Government's.

Jerrod Thompson, Federal Defenders of New York, New York, NY, for Defendant's.

## OPINION & ORDER

ROBERT P. PATTERSON, JR., District Judge.

On September 14, 2012, Defendant Walter Wilson ("the Defendant"), charged with (1) possessing, with the intent to distribute, a controlled substance, in violation of 21 U.S.C. §§ 812, 841(a)(1); (2) possession or use of a firearm during and in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i); and (3) possession of a firearm after having been convicted of a felony, in violation of 18 U.S.C. § 922(g)(1), moved to suppress both his post-arrest statements to the officers and physical evidence seized from his bedroom. In support of his motion, the Defendant filed a declaration ("Wilson Decl.") on that same date.

On October 5, 2012, the Court held a suppression hearing. The Government called one witness, New York City Police Department ("NYPD") Officer Jhonatan Hernandez ("Officer Hernandez"), and introduced five exhibits: (1) the Defendant's videotaped statement to the Bronx District Attorney's Office ("Gov't Ex. 13"); (2) the consent to search form signed by the Defendant ("Gov't Ex. 6"); (3) the *Miranda* waiver form signed by the Defendant; (4) three guns found in the Defendant's bedroom ("Gov't Ex. 20"); and (5) thirty individually wrapped zip-lock bags of marijuana found in the Defendant's bedroom ("Gov't Ex. 21"). The Defense called two witnesses, NYPD Officer Roberto Suarez ("Officer Suarez") and Sharmaine Leslie ("Ms. Leslie"), the Defendant's girlfriend. The Defense also introduced two exhibits: 1) Officer Hernandez's memo book (Def. Ex. A) and 2) the complaint filed in Bronx Supreme Court, Criminal Division (Def. Ex. B, hereinafter "Bronx Compl."). The Defendant did not testify.

For the reasons detailed below, the Defendant's motion is granted in part and denied in part.

## I. *Facts*

On May 9, 2012, NYPD Officers Hernandez and Suarez responded to a domestic disturbance complaint at an apartment located at 1392 Franklin Avenue, Bronx, New York (the "1392 Apartment"). (Tr. of Oct. 5, 2012 Hr'g, Test. of Officer Hernandez ("Hernandez Tr.") at 17; Tr. of Oct. 5, 2012 Hr'g, Test. of Officer Suarez ("Suarez Tr.") at 69.) Officer Hernandez testified that when he and Officer Suarez arrived on the scene at 6:10 p.m., the Defendant and his girlfriend, Ms. Leslie, were standing outside of the building, though the officers did not know their identities at that time. (Hernandez Tr. at 17.) Officer Hernandez asked the Defendant whether he had a key for the building. (*Id.*) The Defendant answered "yes" and opened the building's door. (*Id.* at 18.)

When the officers arrived at the 1392 Apartment, which is located on the fourth floor of the building, the complainant, Latoya Slaughter ("Ms. Slaughter"), alleged that the Defendant—her brother—had "pulled a gun on her" during a dispute and had just left the location.[1] (*Id.* at 18; Suarez Tr. at 69, 75; Bronx Compl.; Gov't Ex. 13 at 20:11:16–20:13, 20:13:45–20:14:59.) Based on a description of the Defendant provided by Ms. Slaughter, the officers then stopped the Defendant and Ms. Leslie approximately three blocks from the 1392 Apartment. (Hernandez Tr. at 19; Suarez Tr. at 69.) Officer Suarez frisked the Defendant but did not find a weapon. (Hernandez Tr. at 19; Suarez Tr. at 76.) Officer Hernandez frisked Ms. Leslie. (Hernandez Tr. at 19–20; Tr. of Oct. 5, 2012 Hr'g, Test. of Sharmaine Leslie ("Leslie Tr.") at 59.) Although he did not find a weapon, his search of Ms. Leslie's purse revealed more than thirty ziplock bags of marijuana. (*Id.*) The officers then arrested the Defendant and Ms. Leslie, handcuffed them, placed them in the rear of the police car, and drove them back to 1392 Franklin Avenue.[2] (Hernandez Tr.

1. In his videotaped statement, the Defendant admitted getting into a dispute with his sister but denied threatening her with a weapon. (Gov't Ex. 13 at 20:13:04–20:13:10.)

2. The officers provided contradictory accounts of what happened next. Officer Hernandez testified that upon arriving back at 1392 Franklin Avenue, he called his sergeant to inform him that he had two people in custody, and shortly thereafter the sergeant arrived along with his driver, who was also a police officer. (Hernandez Tr. at 20.) On direct examination, Officer Hernandez testified that he asked the sergeant to wait with the Defendant and Ms. Leslie, who were still handcuffed in the back of the police car, while he went back upstairs to speak with Ms. Slaughter about the incident. (Hernandez Tr.

at 20; Suarez Tr. at 69, 75; Gov't Ex. 13 at 20:18:45.) The officers did not issue *Miranda* warnings at this time. (Wilson Decl. ¶ 5; Hernandez Tr. at 20; Suarez Tr. at 77.)

The officers then left the car and went upstairs to the fourth floor apartment, where Officer Hernandez informed Ms. Slaughter that the officers had located the Defendant but that he did not have a gun. (Hernandez Tr. at 20–21; Suarez Tr. at 77.) According to Officer Hernandez, she responded "if he doesn't have the gun with him, he probably left it in his room." (Hernandez Tr. at 20–21.) Officer Hernandez testified that he was not able to go into the room at that time because "the bedroom was locked," and Ms. Slaughter told the officers that only the Defendant had access to the room. (Hernandez Tr. at 21.) Ms. Slaughter then called the owner of the apartment, Latonica Wilson ("Ms. Wilson"), at work, and Officer Suarez asked the woman on the phone for her consent to enter the locked bedroom, which she gave.[3] (Suarez Tr. at 71–72, 78.) Nevertheless, because the officers were not sure if the Defendant was paying rent for the room or just staying there, they then returned downstairs to ask the Defendant for his consent to enter his bedroom. (Hernandez Tr. at 21; Suarez Tr. at 78.)

The officers and the Defendant provided contradictory accounts of the conversation that followed, though they agree that the Defendant was questioned while still handcuffed in the back of the police cruiser and without having been informed of his *Miranda* rights.[4] (Wilson Decl. ¶ 7; Hernandez Tr. at 23–24; Suarez Tr. at 70.) According to Officer Hernandez, the Defendant admitted having a gun in his locked bedroom and provided the officers with a key to open it:

Q: What specifically did you say to the defendant?

A: I asked the defendant, your sister told me that you pulled a gun on her, and we need to know where is the gun.

Q: What did he respond?

A: It's a fake gun that I have in my room. Then I asked the defendant, the room is locked, do you have a key for the bedroom? Yes. And where is the key? It's in my back pocket. Can I take the key? He said yes.

Q: Did you say anything else of [sic] the defendant?

A: I asked the defendant if it's ok for us to go into the room and look for the weapon.

Q: How did he respond?

---

at 20.) On cross-examination, however, Officer Hernandez testified that he, Officer Suarez, and the sergeant went upstairs together. (*Id.* at 40, 45.) Officer Suarez testified that no one contacted the sergeant until after he and Officer Hernandez went back upstairs to the 1392 Apartment and interviewed Ms. Slaughter. (Suarez Tr. at 79.) Officer Suarez's description seems incredible as it would indicate that the officers left their handcuffed suspects alone in the patrol car, in violation of standard police procedure.

**3.** Officer Suarez did not, however, confirm the woman on the phone's identity in any way. (Suarez Tr. at 72.) The parties stipu-

lated that Ms. Wilson, the leaseholder of the 1392 Apartment, did not have keys that would allow entry into the Defendant's bedroom. (*Id.* at 88.)

**4.** Officer Hernandez testified that "[u]sually, when we do an investigation on the street, we don't give the *Miranda* warning." (Hernandez Tr. at 24.) Moreover, he stated that no *Miranda* warnings were necessary before asking the Defendant for a key and his permission to enter the locked bedroom because "We got verbal consent. We just asked him if we could get the gun for evidence of this incident." (*Id.*)

A: Yes.

[. . .]

Q: Did you understand the defendant to be giving you permission to take the key?

A: Yes.

Q: Did you understand the defendant to be giving you permission to search the room?

A: Yes.

(Hernandez Tr. at 22; *see also* Suarez Tr. at 78–79.) Officer Hernandez recorded in his memo book that "Deft. Wilson, Walter gave consent and loc of firearm" at 18:50, (Def. Ex. A; Hernandez Tr. at 38–39), however, the officers did not memorialize in writing the Defendant's alleged consent at that time. (Hernandez Tr. at 23.) Officer Hernandez stated that the door of the patrol vehicle was open while he questioned the Defendant and that he did not draw his weapon, yell, or threaten the Defendant during the conversation. (*Id.* at 23–24.)

Officer Suarez could not remember any of the details of the conversation other than the Defendant's characterization of the weapons in his bedroom as "toy guns." (Suarez Tr. at 78–79.) Officer Suarez testified that he did not see the Defendant give Officer Hernandez a key and that the Defendant did not give him anything either. (*Id.*)

According to Officer Hernandez, after he finished questioning the Defendant, he "grabbed the key" and "went back upstairs" to the 1392 Apartment where he

"tried the key into the bedroom" but "[t]he key didn't work." (Hernandez Tr. at 24–25; *see also id.* at 43–44.) Officer Hernandez then asked Ms. Slaughter, the alleged victim, "if she could go to the fire escape" that connected the 1392 Apartment's living room with the Defendant's bedroom, enter the bedroom through the window, and open it from the inside. (*Id.* at 25.) She complied, allowing the officers to enter.[5] (*Id.*) They then observed in plain view "samurai swords" "on top of a bed" and "approximately 30 bags" of "marijuana on top of a dresser." (*Id.* at 25–26.) They did not see any guns.[6] (*Id.* at 26.) The officers then returned downstairs to ask the Defendant for the exact location of the guns. (*Id.* at 26.)

The Defendant provided a contrary account of his response to Officer Hernandez's attempt to gain his consent. In his statement to the Bronx District Attorney's Office, which was videotaped on May 10, 2012, the Defendant corroborated that Officer Hernandez asked him whether there was a gun in his room but denied providing Officer Hernandez with his keys:

Q: They brought you back to the apartment, is that what they did?

A: [. . .] They go to the building, they come back. He's like, um, do you have your keys on you? I'm like, yeah. He said, can I have them? I said no. He like, why not? I said, what you need my keys for? Ring the bell, you know they upstairs,

---

5. Officer Suarez testified that he "didn't see how they got into the room." (Suarez Tr. at 80.) According to Officer Suarez, he had gone downstairs to check on the sergeant's driver and learned that the bedroom door had been opened after Officer Hernandez had already entered. (*Id.* at 73, 81.)

6. Officer Hernandez stated on the complaint form that he also saw fifty-two .22 caliber live

rounds of ammunition on the floor of the bedroom. (Bronx Compl.; Hernandez Tr. at 42.) He signed the complaint form, swearing to its accuracy under penalty of perjury. (Hernandez Tr. at 41.) On cross-examination, however, Officer Hernandez admitted that the form was inaccurate when he signed it. (*Id.* at 42.) He testified that Ms. Slaughter gave him the .22 caliber rounds, and that she says she found them in the kitchen. (*Id.*)

ring the bell. [He said n]o, just give me your keys.

(Gov't Ex. 13 at 20:18:42–20:19:09.) Here, the Defendant's assertion that the officers do not need his keys because they know his sister is "upstairs" and therefore they should "ring the bell" indicate that he is referring to Officer Hernandez's request for keys to the building's entrance, not the officer's later request for keys to the door to the Defendant's bedroom.[7] According to the Defendant's declaration, he did not provide the officers with keys to his locked bedroom: "The officer then asked me for the keys to my locked bedroom so that he could search it. I refused to give him my keys."[8] (Wilson Decl. ¶ 8.)

Ms. Leslie, the Defendant's girlfriend, testified that at some point after the officers had driven her and the Defendant back to 1392 Franklin Avenue and returned upstairs to the 1392 Apartment, one of the officers came back downstairs and searched through her purse without her consent, looking for her keys. (Tr. of Oct. 5, 2012 Hr'g, Test. of Sharmaine Leslie ("Leslie Tr.") at 53–57, 66–67.) According to Ms. Leslie, although the officer found her keys, he put them back in her purse because "somebody told them that they didn't need them" since the police "already got in the room." (*Id.* at 54, 56, 65–66.)

Regardless of whether the officers first attempted to enter the Defendant's bedroom by using a key he consensually provided and only resorted to having Ms. Slaughter climb onto the fire escape and unlock the room from the inside once the provided keys failed to work, as the officers claim, or whether they asked Ms. Slaughter to enter the room through the window in order to override the Defendant's refusal of consent, as the Defendant claims, the parties agree that once inside the bedroom, the officers did not observe any guns in plain sight,[9] (Hernandez Tr. at 26, 43; Suarez Tr. at 73–74), and consequently then returned downstairs to further question the Defendant about the whereabouts of the weapon he had allegedly used to threaten his sister. (Hernandez Tr. at 36, 43.) According to the officers, the Defendant admitted to them that he had guns in his bedroom and specifically directed the officers where to find them. (Hernandez Tr. at 24, 26–27; Suarez Tr. at 80–81.) Indeed, in his videotaped statement, the Defendant admitted describing the exact location of the guns to the officers:

Q: Did you ever tell the officers where they would be able to find handguns?

A: What he said to me, he went upstairs, he came back down, he said listen, do you have anything, in your room that could resemble a weapon? I said yeah, a lot of them. All the swords, everything in my room can be taken as a weapon. He said,

---

7. The Defendant's video-taped statement includes no other references to the officers requesting keys from the Defendant.

8. Ms. Leslie, the Defendant's girlfriend, testified that the Defendant did not have his keys with him because he had left them in the house "after having a conversation with his family members" and leaving with Ms. Leslie. (Leslie Tr. at 57.) Specifically, she "recall[ed] seeing the keys in the house on the rack" and testified that she used her key to lock the front door. (*Id.*) Ms. Leslie's testimony is directly contradicted by the Defendant's own admission that he had his keys in his possession. (Gov't Ex. 13 at 20:12:25, 20:18:42–20:19:09; Wilson Decl. ¶ 8.)

9. The Court notes that Officer Hernandez's testimony is not consistent with what he wrote in his memo book, where he noted that he recovered three guns, eight swords, and thirty bags of marijuana "in plain view" from the Defendant's bedroom. (Hernandez Tr. at 43.)

do you have anything in your room that could look like a gun? I said … first and foremost, ain't none of them real. They don't fire, they broke, they useless. So I said, but you know what, I'm going to tell them about them just because I don't want them to go tear up my room looking for something that don't exist. That's number one. Number two, I don't want them to think I'm hiding anything. So I said look in the bin. There's in the bin once you dig everything out at the bottom of the bin you'll find three handguns, one is totally fake … all of them are broke. I found every last one of them.

(Gov't Ex. 13 at 20:18:45–20:20:45.) Similarly, the Defendant admits in his declaration that he "told the officer there were three fake guns in a box [in] my room." (Wilson Decl. ¶ 8.) According to the Defendant's own videotaped statement, he even volunteered to help the officers find the guns:

Q: So at any time, did you bring any of those firearms out and point it at your sister?

A: Never. You can even get the officer in here. They had to keep coming up and down the stairs to tell me they couldn't find it. I said all you have to do is dump everything out. If you don't find it when you go back up there, I will come up there and dump everything out the bin and show them to you.

(Gov't Ex. 13 at 20:28:15–20:28:38.) Officer Hernandez then returned to the 1392 Apartment and found one imitation pistol and two real guns, as well as a digital scale, in the gray container at the foot of the Defendant's bed, just as he had described. (Hernandez Tr. at 26–27.) Officer Hernandez then placed the guns, drugs, scale, and swords in an evidence collection bag. (*Id.* at 27.)

The officers then transported the Defendant and Ms. Leslie to the police precinct, where Officer Hernandez vouchered the evidence, (Hernandez Tr. at 27–30), and Officer Suarez obtained and presented a Consent to Search Form to the Defendant, which the Defendant signed, (*id.* at 30–31; Suarez Tr. at 82–83). Officer Suarez filled out the top portion of the form containing the Defendant's name, address, and other personal information based on information received from the Defendant. (Suarez Tr. at 84.) The form indicates that the Defendant gave consent to the officers at 18:50 hours,[10] although the parties agree that the form itself was not signed by the Defendant until much later in the evening. (Gov't Ex. 6; Hernandez Tr. at 32; Suarez Tr. at 83–85.) Based on his memo book entry,'Officer Suarez instructed the Defendant to enter 18:50 as the time of consent. (Suarez Tr. at 88.) Although only Officer Suarez was present when the Defendant signed the Consent to Search Form, Officer Hernandez signed the form as a witness. (Hernandez Tr. at 33–34; Suarez Tr. at 83–84.)

According to the Defendant, "[t]he officers presented me with several papers to sign, telling me that I would be released once the papers were signed. I signed the papers without reading them. I later learned that one of the papers I signed was a form granting the officers my consent to search 1392 Franklin Avenue." (Wilson Decl. ¶¶ 14–15.) Officer Suarez testified, however, that the form was explained to the Defendant and that he indicated that he understood both the form

---

**10.** Both officers denied that they wrote the date and time on the form indicating when it was signed. (Hernandez Tr. at 33; Suarez Tr. at 83.) Specifically, both officers denied that the date and time were written in their handwriting.(*Id.*)

and that it "represented the oral consent he had given earlier that evening." (Suarez Tr. at 85–86.)

## II. *Legal Standard*

█ A warrantless search, even of a home, is constitutionally permissible if it is conducted pursuant to valid consent. *See Groh v. Ramirez*, 540 U.S. 551, 552, 124 S.Ct. 1284, 157 L.Ed.2d 1068 (2004); *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). Consent may be granted either explicitly or implicitly, *United States v. Buettner-Janusch*, 646 F.2d 759, 764 (2d Cir.1981), and it may be inferred from an individual's words, gestures, or conduct. *Id.* ("A search may be lawful even if the person giving consent does not recite the talismanic phrase: 'You have my permission to search.' "); *see also United States v. Grant*, 375 Fed.Appx. 79, 80–81 (2d Cir. 2010) (holding that verbal consent was sufficient despite concerns about the validity of the written consent to search form). Consent must be given freely and voluntarily to be valid. *Schneckloth*, 412 U.S. at 222, 93 S.Ct. 2041.

█ Although police officers are generally required to advise a suspect in custody of his *Miranda* rights before interrogating him, *see Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *United States v. Haskin*, 228 F.3d 151 (2d Cir.2000), when public safety is endangered by exigent circumstances, police officers may ask a suspect in custody questions targeted at neutralizing the threat without first providing *Miranda* warnings.[11] *New York v. Quarles*, 467 U.S. 649, 655, 657–58, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984); *United States v. Ferguson*, 702 F.3d 89, 95–96 (2d Cir.2012).

█ Even in a situation where *Miranda* warnings are required, police failure to provide the warnings does not automatically render the subject's subsequent unwarned statements involuntary. *See United States v. Harris*, No. 11 CR 92, 2011 WL 3273241, at *10 (S.D.N.Y. July 27, 2011). A suspect who has not received required *Miranda* warnings can still give valid voluntary consent to a search of his home. *See United States v. Patane*, 542 U.S. 630, 631, 124 S.Ct. 2620, 159 L.Ed.2d 667 (2004). In such a scenario, the appropriate remedy is suppression of the unwarned statements; the physical evidence generated by the resulting consent-based search, however, remains admissible. *Id.*

## III. *Discussion*

Where the Government argues that a warrantless search conducted by law enforcement officers was conducted pursuant to valid consent, the Government bears the burden of proving by a preponderance of the evidence that consent was given and that it was given voluntarily. *Bumper v. North Carolina.*, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968); *United States v. Sanchez*, 635 F.2d 47, 58 (2d Cir.1980). Here, the Government argues that Officers Hernandez and Suarez received three

11. Courts also recognize a public safely exception to the Fourth Amendment's warrant requirement, allowing officers to conduct warrantless searches when a "true emergency" exists that renders "the needs of law enforcement so compelling that a warrantless search is objectively reasonable," such as when there exists a "risk of danger to the police or to other persons inside or outside [a] dwelling." *United States v. Simmons*, 661 F.3d 151, 157 (2d Cir.2011). The Government does not claim that such an exigency existed here. As discussed *infra,* the Government raises the public safely exception with respect to the officers' decision to question the Defendant about the existence and location of his gun without first advising him of his *Miranda* rights, but the Government relies solely on the Defendant's consent to justify the officers' warrantless entry into* his locked bedroom.

kinds of consent to search the Defendant's locked bedroom within the 1392 Apartment: express consent from Ms. Wilson, the 1392 Apartment's leaseholder; express consent from the Defendant; and implied consent from the Defendant. Each of these contentions will be analyzed in turn.

### A. Consent to the Search by the Leaseholder

▮ Valid consent to search a home may only be given by a lawful occupant of the premises. *Sanchez*, 635 F.2d at 58. If the allegedly consenting party is someone other than the defendant, that party must have "common authority" over the premises to be searched. *United States v. Matlock*, 415 U.S. 164, 171, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974); *see also United States v. Davis*, 967 F.2d 84 (2d Cir.1992). Courts may not infer common authority "from the mere property interest a third party has in the property." *Matlock*, 415 U.S. at 171 n. 7, 94 S.Ct. 988. Instead, common authority is determined based on a fact-intensive inquiry that considers the parties' access, use, and reasonable expectations of privacy. *Buettner–Janusch*, 646 F.2d at 766. In rental property situations, a landlord does not have common authority over property rented a tenant and thus may not give valid consent to search it. *See Georgia v. Randolph*, 547 U.S. 103, 110–111, 126 S.Ct. 1515, 164 L.Ed.2d 208 (2006) (citing *Chapman v. United States*, 365 U.S. 610, 81 S.Ct. 776, 5 L.Ed.2d 828 (1961) (holding that landlord could not validly consent to the search of a house he had rented to another)).

▮ Here, the Defendant states that he shares the 1392 Apartment with his sister, Ms. Wilson. (Wilson Decl. ¶ 5.) The Defendant's bedroom, however, "is not a shared space in the home." (*Id.* ¶ 11.)

According to the Defendant, he "pay[s] rent for [his] use of the room and no one else has access to, control over, or an interest in that room." (*Id.*) The Defendant states that he "always lock[s] the door to prevent anyone from entering without [his] permission." (*Id.*) The Government does not challenge the Defendant's characterization of the room. In fact, the Government stipulated that Ms. Wilson, the holder of the lease on the 1392 Apartment, did not have keys to enter the Defendant's locked bedroom. (Suarez Tr. at 88.)

On the basis of these facts, Ms. Wilson did not have "common authority" over the Defendant's locked bedroom, *see Matlock*, 415 U.S. at 171, 94 S.Ct. 988, and therefore could not provide the officers with valid consent to enter it, *see Chapman*, 365 U.S. 610, 81 S.Ct. 776.

### B. Consent to the Search Given by the Defendant

A suspect may grant officers express consent to search his property either verbally or in writing. *See Grant*, 375 Fed. Appx. at 80–81; *U.S. v. Milan–Colon*, No. 91 CR 685, 1992 WL 236218, at *37 (S.D.N.Y. Sept. 8, 1992). Here, the Government argues that the Defendant voluntarily provided both verbal consent at the scene as well as written consent when he signed a Consent to Search Form (Gov't Ex. 6) at the police precinct.

#### i. *Application of Miranda*

▮ It is well-settled that *Miranda* rights attach at the moment a suspect is placed in custody, *California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983), and that absent exigent circumstances, a suspect must be informed of his *Miranda* rights before being subjected to custodial interrogation,[12] *Has-*

---

12. "Interrogation" is defined as "any words or actions on the part of the police ... that the police know are reasonably likely to elicit an incriminating response," with the exception of questions targeting routine pedigree

*kin,* 228 F.3d 151. If police fail to provide a suspect with required *Miranda* warnings, the suspect's unwarned statements are inadmissible for purposes of the prosecution's case in chief. *See, e.g., United States v. Patane,* 542 U.S. 630, 631, 124 S.Ct. 2620, 159 L.Ed.2d 667 (2004).

■■■ Here, it is undisputed that the officers did not read the Defendant his *Miranda* rights before asking him whether he possessed weapons in his bedroom and where they were located. (Wilson Decl. ¶¶ 5, 7; Hernandez Tr. at 20; Suarez Tr. at 77.) The Government argues, however, that the "public safety exception" to *Miranda* established in *Quarles,* 467 U.S. at 655, 104 S.Ct. 2626, rendered it unnecessary for the police to advise the Defendant of his *Miranda* rights prior to asking him these questions. (Gov't Mem. at 19–20.) In support, the Government contends that "all of the Officers' questions [of the arrested but un-*Mirandized* Defendant] focused on the location of the weapon," and cites the officers' testimony that their primary concern in questioning the Defendant was locating the gun. (*Id.* at 20 (citing *Hernandez* Tr. at 24; Suarez Tr. at 69, 77).) The Defendant does not contest this assertion.

■■■ The subjective "motivation of the individual officers involved" is irrelevant, however. *Quarles,* 467 U.S. at 655, 104 S.Ct. 2626. The availability of the public safety exception is based on an objective standard that asks whether a reasonable officer would perceive a dangerous situation to exist, *Simmons,* 661 F.3d at 156, and the exception applies only so long as the situation remains dangerous, *United States v. Reyes,* 353 F.3d 148, 152 (2d Cir.2003) (citing *Quarles,* 467 U.S. at 656, 658, 104 S.Ct. 2626). Once the danger has

been neutralized, police must observe *Miranda's* requirements. *See Simmons,* 661 F.3d at 156; *see also Ferguson,* 702 F.3d at 96 (recognizing that the "immediacy of threats to public safety is highly context-dependant" and thus there is "no template" for determining when it applies other than "examining the totality of the circumstances in a given case") (internal quotation marks and citations omitted).

In *Quarles.* the police had reason to believe that an apprehended suspect had just discarded his gun in a supermarket, where the officers worried it might be found and used by an accomplice, customer, or employee. *Id.* at 657, 104 S.Ct. 2626. The *Quarles* Court explained the pragmatic concerns underlying its decision as follows:

> We decline to place officers ... in the untenable position of having to consider, often in a matter of seconds, whether it best serves society for them to ask the necessary questions without the *Miranda* warnings and render whatever probative evidence they uncover inadmissible, or for them to give the warnings in order to preserve the admissibility of evidence they might uncover but possibly damage or destroy their ability to obtain that evidence and neutralize the volatile situation confronting them.

*Id.* at 657–58, 104 S.Ct. 2626.

Here, the officers had reason to believe that the Defendant brandished a gun during a heated dispute with his sister at their shared apartment shortly before the officers arrested the Defendant and therefore had reason to believe that the Defendant was dangerous. *See Simmons,* 661 F.3d at 156; *United States v. Newton,* 369 F.3d, 659, 663 (2d Cir.2004). The officers' frisk

information. *Rhode Island v. Innis,* 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980); *see also United States v. Morales,* 834 F.2d 35, 38 (2d Cir.1987) (holding that inter-

rogation occurs whenever law enforcement officers directly question a suspect for an investigatory purpose).

search of the Defendant, however, revealed that he did not have a weapon on his person. (Hernandez Tr. at 19.) Given the facts as they appeared to the officers at the time of the arrest, it was reasonable for them to conclude that the public safety remained endangered until the gun had been recovered. *See Ferguson,* 702 F.3d at 94; *Simmons,* 661 F.3d at 156; *Newton,* 369 F.3d at 663.

The public safety exception is "circumscribed by the exigency which justifies it." [13] *Reyes,* 353 F.3d at 152 (citing *Quarles,* 467 U.S. at 656, 658, 104 S.Ct. 2626). Pre-*Miranda* questioning concerning the location of a weapon is not justified when "the suspect and the surrounding area ha[ve] been secured and any threat to the officer or to public safety [has been] eliminated prior to the unwarned questioning." *Id.* at 153.

Here, at the time of the unwarned questioning, the Defendant, who was handcuffed and seated in the back of the patrol car, presented no threat to the complainant or the officers. Moreover, at the time the officers returned downstairs to continue their unwarned questioning of the Defendant, they already understood from the complainant that the gun was most likely located in the Defendant's bedroom, (Hernandez Tr. at 20–21 ("if he don't have the gun with him, he probably left it in his room")), which Officer Hernandez knew was locked and that no one besides the

Defendant had a key. (Hernandez Tr. at 20–21.) The parties agree that Officer Hernandez then returned downstairs to question the Defendant about whether he possessed a weapon in his room and, if so, where it was located. (*Id.* at 22; Wilson Decl. ¶ 7; Gov't Ex. 13 at 20:19:20–20:20:20.) The parties also agree that the Defendant answered the officer's first question about the location of the gun ("I asked the defendant, your sister told me that you pulled a gun on her, and we need to know where is the gun") by admitting that he had one or more "fake" guns [14] in his room. (Hernandez Tr. at 22; Wilson Decl. ¶ 7; Gov't Ex. 13 at 20:18:45–20:20:45.) Given that Officer Hernandez knew that the bedroom was locked and that only the handcuffed Defendant had a key to it, the Defendant's answer eliminated any reasonable concern that the gun presented a public safety danger.

Consequently, the Court finds that once the Defendant informed the officers that the gun in question was located in his locked bedroom, confirming the complainant's suggestion, (Hernandez Tr. at 20–21), the officers no longer had a reasonable basis to believe that they faced a "dangerous" or "volatile" situation, *see Quarles,* 467 U.S. at 656–658, 104 S.Ct. 2626; *Simmons,* 661 F.3d at 155–56, and the public safety exception no longer applied, *see Reyes,* 353 F.3d at 152. At this point the officers should have advised the Defendant

---

**13.** The officers' actions belie the Government's argument that the officers were dealing with an exigent situation. Officers Hernandez and Suarez did not behave as if they had only "a matter of seconds" to determine whether it "best serve[d] society for them to ask the necessary questions without the *Miranda* warnings" or first advise the Defendant of his rights. *Id.* Instead, after arresting the Defendant and his girlfriend, the officers took the time to drive them back to the 1392 Apartment, waited for the sergeant to arrive on the scene, went back upstairs to interview the complainant, and only began to question the Defendant about the gun after returning downstairs to the patrol car, where the defendant was secured in handcuffs.

**14.** The parties differ on the number of guns the Defendant referred to in his answer. Officer Hernandez testified that the Defendant said "[i]t's a fake gun that I have in my room," (Hernandez Tr. at 22), while the Defendant states in his declaration that "I told the officer there were three fake guns in a box in my room." (Wilson Decl. ¶ 7.)

of his *Miranda* rights before questioning him further. Accordingly, the Defendant's statement that he had one or more fake guns in his room is admissible, but all of his subsequent post-arrest, pre-*Miranda* statements are inadmissible.

This does not end the Court's inquiry, however. The Court must also evaluate the admissibility of the physical evidence seized by the officers from the Defendant's locked bedroom without a warrant. As the Supreme Court explained in *Patane*, a suspect who has not received *Miranda* warnings can still give voluntary consent to a search.[15] *See* 542 U.S. at 643, 124 S.Ct. 2620; *see also Harris*, 2011 WL 3273241, at *10 ("The absence of *Miranda* warnings does not make consent to search invalid *per se* "). Accordingly, if a suspect does voluntarily consent to a search, the physical evidence uncovered by that search is admissible, even if the police obtained the consent without first providing required *Miranda* warnings. *Id.* at 632, 643, 124 S.Ct. 2620. Consequently, the determination turns on whether the Defendant's unwarned statements were nevertheless voluntary, and, if so, whether they constituted express or implied consent for the officers to search his bedroom, obviating the need for the police to first get a warrant. *See Groh*, 540 U.S. at 552, 124 S.Ct. 1284; *Schneckloth*, 412 U.S. at 219, 93 S.Ct. 2041; *Buettner–Janusch*, 646 F.2d at 764.

### ii. *Voluntariness*

■■■■ Consent must be given voluntarily, *Sanchez*, 635 F.2d at 58, and courts assess voluntariness by evaluating the totality of the circumstances, *Schneckloth*, 412 U.S. at 227, 93 S.Ct. 2041. In order to be considered voluntary, consent must be the product of an "individual's free and unconstrained choice," and not the "product of duress or coercion, flagrant or subtle" or "mere acquiescence in a show of authority." *United States v. Wilson*, 11 F.3d 346, 351 (2d Cir.1993). Courts have found that the voluntariness of a subject's consent has been undermined when officers act to overwhelm a subject's will and "critically impair[ ]" his "capacity for self-determination," *see United States v. McCoy*, 407 Fed.Appx. 514, 516 (2d Cir. 2010), such as when the subject has been unlawfully arrested, *United States v. Long Huang You*, 198 F.Supp.2d 393, 405 (S.D.N.Y.2002), when several officers surround the subject in a threatening manner, *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980), when officers arrive at the subject's home in the middle of the night, *Kaupp v. Texas*, 538 U.S. 626, 631–32, 123 S.Ct. 1843, 155 L.Ed.2d 814 (2003), and when officers have used guile, ruses, or force to enter the

---

**15.** In *Patane*, police arrested the defendant, a convicted felon, at his home for violating a restraining order. *Id.* at 630, 124 S.Ct. 2620 (incorporating by reference facts found in *United States v. Patane*, 304 F.3d 1013, 1015 (10th Cir.2002)). The police had reason to believe he was dangerous and possessed a gun. *Id.* Without reading the defendant his *Miranda* rights, police inquired about the gun and, based on defendant's unwarned statements directing them to the gun's location, the officers seized it from his bedroom. *Id.* In holding that the defendant's statements to the officers must be excluded from the prosecution's case in chief but that the gun was admissible, the Supreme Court explained that the "[i]ntroduction of the nontestimonial fruit of a voluntary statement, such as respondent's pistol, does not implicate the [Self-incrimination] Clause. It presents no risk that a defendant's coerced statements (however defined) will be used against him at a criminal trial." *Patane*, 542 U.S. at 632, 124 S.Ct. 2620. The Court held that "the exclusion of unwarned statements is a complete and sufficient remedy for any perceived *Miranda* violation." and the "fruit of the poisonous tree" doctrine articulated in *Wong Sun v. U.S.*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), need not be applied to physical evidence seized as a result of unwarned but voluntary statements. *Patane*, 542 U.S. at 631–32, 124 S.Ct. 2620.

premises to be searched, *Hoffa v. United States,* 385 U.S. 293, 301, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966); *United States v. Montes–Reyes,* 547 F.Supp.2d 281, 288–290 n. 7, n. 10 (S.D.N.Y.2008); *Djonbalic v. City of New York,* No. 99 CV 11398, 2000 WL 1146631, at *10 (S.D.N.Y. Aug. 14, 2000).

■ Here, the Defense argues that even if the Defendant verbally consented to the search, his consent was "mere[ly] acquiescence in a show of authority." (Def.'s Mem. at 13 (citing *Wilson,* 11 F.3d at 351).) To support this contention, the Defense notes only that Officers Hernandez and Suarez presented "inconsistent testimony ... on the crucial question of when consent was obtained" and that the Consent to Search Form was presented after the search was conducted. (*Id.* at 12–13.) The Defense does not assert that the officers acted in any way to overwhelm the Defendant's will. *See McCoy,* 407 Fed.Appx. at 516.

The Defense's argument about the officers' inconsistent testimony challenges the sequence of events as laid out by the officers, as well as what exactly the Defendant said to whom and when; however, the Defense has not presented any evidence or argument that the officers engaged in coercive methods. (Def.'s Mem. at 12–13.) The officers' failures to advise the Defendant of his *Miranda* rights and to present the Consent to Search Form prior to conducting their search of the Defendant's bedroom do not constitute acts of coercion sufficient to have overwhelmed the Defendant's ability to act voluntarily. *See, e.g., Patane,* 542 U.S. at 631–32, 124 S.Ct. 2620; *United States v. Agapito,* 477 F.Supp. 706, 714, 717 (S.D.N.Y.1979).

Moreover, although there is no dispute that the Defendant was in custody, handcuffed, and sitting in the back of the police car when Officer Hernandez interrogated him about the location of his gun, these conditions are not sufficient to establish coercion. *See United States v. Watson,* 423 U.S. 411, 424, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976); *United States v. Crespo,* 834 F.2d 267, 271–72 (2d Cir.1987) ("That Crespo was under arrest and in custody, or even handcuffed, does not as a matter of law require a finding of coercion. Nor ... does the Government have an affirmative duty to advise a suspect that he may refuse his consent to an apartment search"). Officer Hernandez testified that he did not draw his weapon, yell at the Defendant, or threaten him. (Hernandez Tr. at 23). Neither the testimony of the Defendant nor that of his girlfriend disputed Officer Hernandez's description of the interrogation. There is therefore no indication that the officers took any coercive action towards the Defendant of the type that courts in this Circuit have previously found to render consent involuntary.

Consequently, the Court finds that the Defendant's unwarned statements to the officers were voluntarily given.

### iii. *Defendant's Express Consent to the Search*

Officer Hernandez testified that he "asked the defendant, your sister told me that you pulled a gun on her, and we need to know where is the gun?" (Hernandez Tr. at 22.) According to Officer Hernandez, the Defendant answered, "[i]t's a fake gun that I have in my room," and told the officer that he had a key to the locked room in his back pocket. (*Id.*) Officer Hernandez states that he asked the Defendant next whether it was "OK for us to go into the room and look for the weapon." (Hernandez Tr. at 22.) Officer Hernandez asserts that the Defendant answered "yes" and allowed the officer to take the key from his back pocket, thus expressly granting his consent for the officers to enter his locked bedroom and search for the weapon. (*Id.*) Officer Hernandez's

memo book entry, which he admits was not written contemporaneously, notes that the Defendant gave verbal consent at 18:50 hours. (Hernandez Tr. at 36–39, 47–48; Def. Ex. A.) Officer Hernandez further testified that Officer Suarez was with him when he tried to use the keys to enter the locked bedroom door, but none of the keys on the Defendant's keychain worked. (Hernandez Tr. at 44.)

The Defense contests Officer Hernandez's account, asserting that after telling the officer that "there were three fake guns in a box [in] in my room," (Wilson Decl. ¶ 7), the Defendant nevertheless "refused to give [the officer his] keys." (*Id.* ¶ 8; *see also* Gov't Ex. 13 at 20:18:42–20:19:09.)

Officer Suarez's testimony also does not align with Officer Hernandez's account. Officer Suarez testified that he and Officer Hernandez sought consent from the Defendant together (Suarez Tr. at 78), and that he was present when the Defendant gave his consent, (*id.* at 85). While he doesn't remember who spoke with the Defendant or "word by word" what the Defendant said to give his consent, he remembers that "[t]he reason [the Defendant] gave was because they were toy guns."[16] (*Id.* at 78–79.) Nevertheless, Officer Suarez did not see Officer Hernandez gain possession of the keys. (*Id.* at 75.)

After being taken to the precinct, the Defendant was presented with a Consent to Search Form, which he signed. (Gov't Ex. A; *see also* Suarez Tr. at 86.) The form states that verbal consent to the

search was given by the Defendant at 18:50 hours. (Gov't Ex. A.) Given that the Consent to Search Form was not presented to the Defendant until significantly after the officers conducted their search of the Defendant's bedroom,[17] the Government admits that the form itself does not constitute valid written express consent to the search on its own. (*See* Gov't Mem. at 10.) The Government argues, however, that the form corroborates Officer Hernandez's version of events, memorializing the verbal consent that Officer Hernandez claims the Defendant provided on the scene at 18:50. (*Id.*)

The Defense contends that although the Defendant signed the Consent to Search Form, it does not constitute his consent to the search. (Def.'s Post–Hearing Mem. of Law ("Def.'s Mem.") at 12–13, Oct. 23, 2012.) He claims that "[t]he officers presented me with several papers to sign, telling me that I would be released once the papers were signed. I signed the papers without reading them." (Wilson Decl. ¶ 14; *see also* Gov't Ex. 13 at 20:27:20–20:27:35.)

The Government asserts that the Defendant's claim of ignorance is not credible. The Government points out that the Defendant admitted in his video statement that he has been arrested multiple times before, making it unlikely that he believed he would be released once he signed the papers. (*See* Gov't Post–Hr'g Mem. of Law in Opp. to Def.'s Mot. to Suppress Statements & Physical Evidence ("Gov't Mem.") at 14.) The Government further notes that the Defendant admitted reading

---

**16.** While the Defendant's statement that he had "toy guns" in the locked bedroom may represent implied consent to search for them, see discussion *infra,* it is unquestionable that it does not constitute express consent.

**17.** Officer Hernandez testified that "[w]e brought him back to the precinct at 1915

hours and that's when he signed. That's when we were processing the arrest, at 1915 hours." (Hernandez Tr. at 38.) Meanwhile, Officer Suarez testified that the Consent to Search Form was not presented to the Defendant until around 9:00 p.m. (Suarez Tr. at 85.)

the *Miranda* form before initialing it, and that the signature line on the Consent to Search Form is in the middle of the page, not at the bottom; the Defendant would have had to examine the form to find it. (*Id.*) The Government contends that, together, these factors make it implausible that the Defendant signed the Consent to Search Form without reading it. (*Id.*) Moreover, Officer Suarez testified that he explained the Consent to Search Form to the Defendant and that the Defendant indicated that he understood that the form represented the oral consent he had given earlier. (Suarez Tr. at 85–86.)

It seems implausible that Officer Suarez would not have observed and remembered the Defendant turning over his keys if he had done so, and it seems implausible that Officer Suarez would have described the Defendant's consent as consisting only of words if there had also been a definitive action—such as handing over keys—that occurred as well. Moreover, Officer Suarez's statement that he did not know the door was locked and never saw anyone try to open it directly contradicts Officer Hernandez's testimony that Officer Suarez was with him when he unsuccessfully tried the Defendant's keys in the door. (Hernandez Tr. at 44.) Finally, Officer Suarez admitted that he instructed the Defendant to enter 18:50 as the time of consent on the Consent to Search Form. (*Id.* at 87–88.)

In light of the lack of corroboration by Officer Suarez and Defendant's contradictory testimony, the Government has failed to prove, by a preponderance of the evidence, that the Defendant gave express consent to the officers' search of his bedroom. *See Bumper*, 391 U.S. at 543, 88 S.Ct. 1788; *Sanchez*, 635 F.2d at 58.

#### iv. *Defendant's Implied Consent to the Search*

 The Government also claims that the Defendant gave the officers implied consent to search his locked bedroom when he provided them with specific directions to the location of the "fake" guns in his room. (Gov't Mem. at 15; *see also* Gov't Ex. 13 at 20:18:45–20:20:45, 20:28:15–20:28:38.) Where, as here, the Government asserts that the subject of a search provided implied consent, the "ultimate question presented is whether the officer had a reasonable basis for believing that there had been consent to the search." *United States v. Garcia*, 56 F.3d 418, 423 (2d Cir.1995) (internal quotation marks and citations omitted). Courts evaluate the validity of a subject's consent by applying an objective reasonableness standard. *Florida v. Jimeno*, 500 U.S. 248, 251, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991). In other words, "what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Id.*

In cases dealing specifically with Defendants who directed officers to the location of guns by statements or gestures, courts have found that those statements and gestures qualify as implied consent. In *United States v. Simmons*, police—responding to a call from the defendant's roommate stating that the defendant had threatened him with a gun—asked the defendant, without first issuing *Miranda* warnings, about whether he had a gun and where it was located. 861 F.Supp.2d 307, 308–10 (S.D.N.Y.2012). The defendant stated "Yes, I do [have a gun] in my room. [ . . . ] It's in the room on the chair by my bed under the papers." *Id.* The district court held that this statement constituted implied consent. *Id.* at 310–11. The court reasoned as follows:

> Informing the police of the precise but concealed location of the gun—under papers and on a particular chair—had no purpose other than to facilitate the immediate seizure of the weapon.... [A] defendant's directions to a firearm amounts to, or may be found to amount

to, implied consent, at least for the limited purpose of retrieving the gun. I find that [the defendant] voluntarily consented to the seizure of the weapon ... as he told police exactly where the weapon was located.

*Id.*

The Second Circuit held similarly in *United States v. Candella,* 469 F.2d 173, 174 (2d Cir.1972). There, the defendant was suspected of transporting firearms across state lines. *Id.* Police arrested the defendant at his home and, after reading him his *Miranda* rights, asked him whether he had on hand any of the guns he was accused of trafficking. *Id.* The defendant responded, " '[s]ome of them are here,' pointing to a carton about five feet away from where he was standing." *Id.* The officers found approximately nineteen guns in the indicated box. *Id.* They then asked the defendant "whether he had any others," and the defendant "indicated a desk or other piece of furniture some five feet away in another direction." *Id.* The officer went there, opened a drawer, and found approximately ten more guns. *Id.*

The Second Circuit, noting that the defendant "pointed to the exact spots where the guns were located and told the officers where they were," held that the defendant's "statement that the guns were in the containers was the equivalent of his opening the containers for the agents' inspection." *Id.* at 175. Consequently, the *Candella* court held that the defendant's statements "constituted [implied] consent to the seizure of the handguns." *Id.* at 174–75. In addition to finding consent to the search, the court further reasoned that the guns were admissible because "once the [defendant] told the agents where the guns were, they were no longer 'concealed' and it was reasonable for the agents to seize them. The evidence was, in effect, in the 'plain view' of the agents." [18] *Id.* at 175 (citing *United States v. Titus,* 445 F.2d 577 (2d Cir.1971)).

Here, paralleling the facts of *Simmons,* the police responded to a call regarding a domestic disturbance in which the Defendant was accused of brandishing a weapon. The Defendant, after receiving *Miranda* warnings, admitted in his videotaped statement that he responded to police questioning about whether he possessed weapons and, if so, where they were located, by providing them with specific directions to where the weapons were concealed, (Gov't Ex. 13 at 20:20:02–20:20:10) ("So I said look in the bin. There's in the bin once you dig everything out at the bottom of the bin you'll find three handguns"), corroborating Officer Hernandez's testimony to the same effect, (Hernandez Tr. at 22–23).

The Defendant's decision to "[i]nform[ ] the police of the precise but concealed

---

**18.** The fact that the Defendant here was not read his *Miranda* rights here before being questioned by police does not make *Candella* distinguishable on the issue of implied consent. *Candella* stands for the proposition that specific directions given to officers about the location of contraband constitutes implied consent for the officers to search that location and seize the contraband. 469 F.2d at 174–75. Here, the Defendant made similar statements directing the officers to the "fake" guns in his bedroom. The fact that the Defendant's statements were unwarned does not render them involuntary or non-consenting, (*see Harris,* 2011 WL 3273241, at *10; *see also* discus-sion *supra* at 16, 18), as there is no evidence showing that the arresting officers took any action to overwhelm the Defendant's will, (*see* discussion *supra* at 17–18). Consequently, the Defendant's statements to the officers were voluntarily given, and *Candella* dictates that they be interpreted as constituting implied consent. Because the statements regarding the location of the guns were unwarned, however, they may not be admitted at trial in the prosecution's case in chief; nevertheless, the physical fruits seized as a result of those statements are admissible. *See Patane,* 542 U.S. at 631–32, 124 S.Ct. 2620.

location of the gun[s] ... had no purpose other than to facilitate the immediate seizure of the weapon[s]." *Simmons*, 861 F.Supp.2d at 311. Also, as the Second Circuit held in *Candella*, the Defendant's "statement that the guns were in the container[ ] was the equivalent of his opening the containers for the agents' inspection." *Candella*, 469 F.2d at 175. In fact, the Defendant went a step further and stated that he had volunteered to open the container for the officers' inspection himself: "If you don't find it when you go back up there, I will come up there and dump everything out the bin and show them to you." (Gov't Ex. 13 at 20:28:30–20:28:38.)

The Defendant's own explanation of his motivations for directing the officers to the location of the guns constitutes implied consent. The Defendant asserted that all three of the guns in the container in his bedroom were inoperable and explained that he directed the officers to their location because he did not want the police to think he was "hiding anything" or "tear up" his room "looking for something that don't exist." (Gov't Ex. 13 at 20:19:44–20:20:02.) By the Defendant's own admission, however, handguns *did* exist in the container in his room. (*Id.* at 20:18:45–20:20:45; Wilson Decl. ¶ 7.)

Consequently, having examined the totality of the circumstances, *see United States v. Juliano*, No. 99 CR 1197, 2000 WL 1206745, at *2 (S.D.N.Y. Aug. 24, 2000), the Court finds that a "typical reasonable person" would have understood the Defendant's statements to the officers as granting them his implied consent to enter his locked bedroom and search the bin at the foot of his bed for guns. *See Jimeno*, 500 U.S. at 251, 111 S.Ct. 1801; *see also Candella*, 469 F.2d at 175; *Simmons*, 861 F.Supp.2d at 308–10. Accordingly, the Court finds that the physical evidence recovered from the Defendant's locked bedroom—including the drugs, swords, and scale discovered in plain view when the officers entered—is admissible on the basis that the Defendant voluntarily gave his implied consent to the search.

## IV. *Conclusion*

The Defendant's motion to suppress his post-arrest statements to the officers and the physical evidence seized from his bedroom is hereby granted in part and denied in part. The Defendant's statement that he had "fake guns" in a box in his room is admissible. The physical evidence recovered from his bedroom as a result of this voluntary statement is admissible. The Defendant's other post-arrest statements given without necessary *Miranda* warnings, however, are inadmissible.

IT IS SO ORDERED.